**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert ANDREEN, Defendant–Appellant.**

No. 77–2889.

United States Court of Appeals,
Ninth Circuit.

Sept. 26, 1980.

1238

Thomas P. Nugent, Haskins, Nugent, Newnham & Kane, San Diego, Cal., for defendant–appellant.

Thomas M. Coffin, Asst. U. S. Atty., argued, Michael H. Walsh, U. S. Atty., Thomas M. Coffin, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff–appellee.

Before WALLACE and KENNEDY, Circuit Judges, and LUCAS,* District Judge.

KENNEDY, Circuit Judge:

Appellant Robert Andreen, an attorney licensed to practice in California, was indicted with numerous codefendants, and charged for violations of federal laws relating to the embezzlement of union trust funds. Andreen was indicted on nine counts for his role in various schemes to embezzle money and credits from trust funds established for San Diego construction workers.[1] He had been the attorney for the trusts. The codefendants were trustees.

Andreen initially faced a jury trial with the codefendants. The trial court denied his motions to sever the counts and to sever Andreen's case from the other defendants. Andreen then waived trial by jury and elected to be tried by the court, simultaneously with eight codefendants' trial by jury. Following a three month trial, generating over 8,000 pages of testimony, the jury returned guilty verdicts on all counts as to Andreen's codefendants. We consider challenges to those convictions in separate dispositions.[2] After receiving the jury verdict as to the codefendants, the court found Andreen guilty on four of nine counts.[3] He received a five–year sentence for each count, to run concurrently.

On appeal Andreen claims the evidence did not establish that he committed acts which are criminal offenses. He claims also that various procedural rulings of the trial court were error. We affirm Andreen's conviction on counts 1, 2, and 6B, and reverse as to count 9. The factual background of the case is complex. The summary of the case presented here is given upon viewing the facts, as we must, in the light most favorable to the prosecution.

Pursuant to collective bargaining agreements between the International Laborers' Union, Local 89 of San Diego and various employer associations, certain trust funds were created for the benefit of members of Local 89 and other designated employees of the signatories. The funds included: (1) San Diego County Construction Laborers' Pension Fund (pension trust) established October 15, 1963; (2) San Diego County Construction Laborers' Group Insurance Trust (health and welfare trust) established August 11, 1954; and (3) San Diego County Construction Laborers' Vacation Trust (vacation trust) established April 21, 1964. All three funds were established under the Taft–Hartley Act, which requires an equal

---

* Honorable Malcolm M. Lucas, United States District Judge for Central District of California, sitting by designation.

1. The multiple count indictment, filed on November 23, 1976, charged Andreen with the following: Count 1–conspiring to embezzle union trust fund assets in violation of 18 U.S.C. §§ 371 and 664; Count 2–aiding and abetting the embezzlement of trust fund assets pursuant to a deferred compensation plan in violation of 18 U.S.C. §§ 664 and 2; Count 3–aiding and abetting the embezzlement of pension trust credits pursuant to a retroactive credit plan in violation of 18 U.S.C. §§ 664 and 2; Count 6A–aiding and abetting embezzlement of $144,-000 in pension funds pursuant to a retroactive credit plan in violation of 18 U.S.C. §§ 664; Count 6B–aiding and abetting the embezzle-

ment of more than $9,000 pursuant to fraudulent disability pension of John Haning; Count 8–aiding and abetting the embezzlement of $24,140 in health and welfare trust funds in violation of 18 U.S.C. §§ 664 and 2; Count 9–embezzling trust funds to pay for unauthorized physical examinations in violation of 18 U.S.C. § 664; Count 11–conspiring to bribe trustees of union trust funds in violation of 18 U.S.C. §§ 371 and 1954; and Count 12–bribery of trustees in violation of 18 U.S.C. § 1954.

2. *United States v. Ford,* 632 F.2d 1354 (9th Cir. 1980).

3. Andreen was convicted on counts 1, 2, 6B, and 9; he was found not guilty on counts 3, 8, 6A, 11, and 12.

number of union and management trustees. 29 U.S.C. § 186.[4] The boards of the three trusts had numerous overlapping memberships.[5]

The embezzlement charges center primarily on two schemes: (1) the method used by the pension trustees to obtain "deferred compensation," calibrated by the value of pension credits; (2) the method used by trustees of the health and welfare and vacation trusts to obtain pension credits. These schemes for trustee remuneration obligated payments of more than $5,000,000 from the trust funds. Some trustees were also charged with embezzling trust funds by retaining payments far exceeding actual expenses for attending seminars and conferences. In addition, the health and welfare trustees and Andreen were charged with embezzlement by obtaining unauthorized physical examinations at trust expense. Finally, the indictment charged a conspiracy to accomplish the substantive counts. For purposes of this opinion, we need to consider only the counts relating to Andreen's aiding and abetting payments of unauthorized sums, as pensions or otherwise, to trustees of the pension trust; his aiding and abetting the unlawful payment of disability to trustee Haning; his receipt of a physical examination; and the conspiracy charge.

*Unauthorized Compensation from Pension Trust (Count 2)*

In count 2 the Government charged that pension trustees converted large sums of pension funds to their own use "pursuant to a so—called 'deferred compensation' plan." All agree that the Local 89 pension plan, involved in count 2, was a plan within the coverage of 18 U.S.C. § 664, which prohibits embezzlements from an employee pension fund. It is not disputed that trustees, in that capacity, were not employees under the plan, and as such were ineligible for

pensions under a separate federal statute. *See* 29 U.S.C. § 186. Andreen claims that deferred compensation payments are distinct from pension payments and therefore legal. We need not address this point, although we think the Government's position has great merit, because an alternate prosecution theory presented to the trial court provides an adequate ground for affirmance. The Government's alternate theory is that even if deferred compensation is distinct from a pension, the compensation here was unreasonable and an unauthorized conversion of funds. The evidence of unreasonable compensation is compelling.

Our task on review is circumscribed. A conviction must be sustained if there is substantial supporting evidence, viewed in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The critical inquiry on review is whether, after viewing the evidence in such a light, a rational trier of fact could conclude that the accused was guilty beyond a reasonable doubt. *United States v. Jones*, 592 F.2d 1038, 1041 (9th Cir. 1979). Because the Government has the burden of proving every element of the offense beyond a reasonable doubt, this standard must be applied to each essential element of the crime. *American Tobacco v. United States*, 328 U.S. 781, 787, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575 (1946); *United States v. Bailey*, 607 F.2d 237 (9th Cir. 1979), *cert. denied,* 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980).

1. The Scope of § 664

By enacting § 664 in 1962, Congress made it a federal crime to embezzle, steal, or willfully and unlawfully convert or abstract assets of an employee welfare or pension benefit plan. 1962 U.S.Code Cong. & Ad. News 1532, 1538, 1547. The legislative history indicates that the intended purpose of

---

4. The trusts were also governed by the former Welfare and Pension Plans Disclosure Act, 29 U.S.C. §§ 301 *et seq.* This act was repealed as of January 1, 1975, by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.,* which provides in part that the repealed act continues to apply to conduct and

events before January 1, 1975. 29 U.S.C. § 1031(a)(1).

5. Appellants Felix, Ford, Little, Thompson, Armstrong, S. Johnson, and Usquiano served as trustees on all three trusts at various times.

§ 664 was to preserve welfare and pension funds for the protection of those entitled to their benefits. 1962 U.S.Code Cong. & Ad. News 1532. *See United States v. Santiago,* 528 F.2d 1130, 1133 (2nd Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795, (1976). The statute provides:

> Any person who embezzles, steals or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined not more than $10,000, or imprisoned not more than five years, or both. As used in this section, the term "any employee welfare plan or employee pension benefit plan" means any such plan subject to the provisions of the Welfare and Pension Plans Disclosure Act.[6]

■ The accepted definitions apply to the extent the statute uses traditional terms. *See Colella v. United States,* 360 F.2d 792 (1st Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *Woxberg v. United States,* 329 F.2d 284 (9th Cir.), *cert. denied,* 379 U.S. 823, 85 S.Ct. 45, 13 L.Ed.2d 33 (1964). "Embezzlement" is such a term. It encompasses the fraudulent appropriation of the property of another by one in lawful possession thereof. *See United States v. Dupee,* 569 F.2d 1061, 1064 (9th Cir. 1978). The concept of unlawful conversion encompasses the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent. *See Morissette v. United States,* 342 U.S. 246, 272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952); *Woxberg v. United States, supra.*

■ The statute goes beyond traditional concepts of embezzlement, however, and imposes liability for an intentional breach of special fiduciary duties imposed by other regulatory statutes or governing instruments. *See* 29 U.S.C. § 186(c).[7] The statute defines an offense "the common thread [of which] is that the defendant, at some stage of the game, has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done." *United States v. Silverman,* 430 F.2d 106, 126–27 (2d Cir. 1970). The essence of the crime is theft and in the context of union funds or pension plans the offense includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent. In this respect lack of authorization may be shown if the diversion is substantially inconsistent with the fiduciary purposes and objectives of the union funds or pension plan, as set forth by statutes, bylaws, charters, or trust documents which govern uses of the funds in question. Whatever imprecision attends this definition is remedied substantially by the requirement of scienter, which is an essential element of the crime. *Cf. Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). The act to be criminal must be willful, which means an act done with a fraudulent intent or a bad purpose or an evil motive.[8]

---

**6.** This statute was amended in 1974 with the enactment of the Employee Retirement Income Security Act (ERISA). 29 U.S.C. §§ 1001 *et seq.* The amendatory language merely changed references from the Welfare Pension Plan Disclosure Act to ERISA.

**7.** 29 U.S.C. § 186(c)(5) provides in part:
(A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance;

. . . . .

(C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities;

**8.** It has been held, under a similar statute, 18 U.S.C. § 657, that the willful intent is equivalent to a reckless disregard for the interests of the protected fund. *United States v. Luxenberg,* 374 F.2d 241, 249 (6th Cir. 1967). We think there is merit to the formulation but need not specifically so hold on the facts of this case.

■ The decided cases interpreting section 664 are few, but a number of opinions have addressed the meaning of a like statute, which prohibits embezzlements from union funds. 29 U.S.C. § 501(c). Parallel language was used in 29 U.S.C. § 501(c) and 18 U.S.C. § 664.[9] Furthermore, Congress passed the two statutes for a similar purpose: to preserve the designated funds for those entitled to their benefits. *See* 1962 U.S.Code Cong. & Ad.News 1532; 1959 U.S. Code Cong. & Ad.News 2318, 2430. We conclude the prohibitory language of both statutes should be given similar interpretation and be applied to similar types of conduct. *Cf. United States v. Ladmer*, 429 F.Supp. 1231, 1240 (E.D.N.Y.1977). Our discussion of Section 501(c) cases, therefore, applies equally to 18 U.S.C. § 664, the statute at issue here.

In some prosecutions under section 501(c) the defense has claimed that union ratification or authorization cured an alleged misappropriation. Alternatively, or conjunctively, the defense has claimed that if the union benefited from an expense, no crime has been committed. Reported opinions reach different conclusions respecting the elements of a section 501(c) violation in these instances. Cases from the First and Second Circuits can be interpreted as allowing a defense to a 501(c) prosecution if funds are spent without authority, but nevertheless with some benefit to the union. *United States v. Ottley*, 509 F.2d 667, 671 & n.6 (2d Cir. 1975); *Colella v. United States*, 360 F.2d 792, 804 (1st Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). The Fifth Circuit has said that union benefit is a defense only if funds are spent with authorization (*e. g.*, with union approval but nevertheless in contravention of a statute); where lack of authorization is shown the Government is not required to make a further showing that the union derived no benefit from the transaction. *United States v. Dixon*, 609 F.2d 827 (5th Cir.

1980); *United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976). The Eighth Circuit agrees that benefit is irrelevant if authorization is lacking, and has left open the question whether absence of benefit to the union is an element of the offense, to be proven by the Government, where the misappropriation has been authorized by the union. *United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974). We interpret the Sixth Circuit as holding that regardless of the findings as to union authorization (or no) or union receipt of benefits (or no), there may nevertheless be a statutory violation; accordingly, these two factors are not invariably elements of the Section 501(c) offense which must be established by the Government. *United States v. Bane*, 583 F.2d 832 (6th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). Nevertheless, facts pertaining to authorization or union benefit are relevant to the question of intent. *Id.*

We noted these authorities and others in our recent decision in *United States v. Marolda*, 615 F.2d 867 (9th Cir. 1980), a case also arising under section 501(c). While we think there is merit to the views we ascribe to the Sixth Circuit, a position similar to the one taken in the concurrence of Judge Larson in *Marolda*, the question of what constitute the elements of the offense when the misappropriation is authorized is not before us here.

■ This is a case in which, as we demonstrate below, the Government has established that funds were taken or converted without union authorization. We now hold that where union authorization is absent, the lack of benefit to the union is not an element of the offense required to be shown as part of the prosecution's case. *See, e. g., United States v. Dixon, supra.* Conversely, the conferring of any benefit in such a case is not a defense, except insofar as it may

---

9. 29 U.S.C. § 501(c) provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

bear upon the defendant's state of mind in committing the acts in question. These principles are applicable to prosecutions under 18 U.S.C. Section 664, as well as 29 U.S.C. Section 501(c).

We reach our conclusion in accord with the Fifth, Sixth, and Eighth Circuits because we believe the purpose of Congress was to protect union and pension funds from any disbursement or conversion contrary to the statutes and instruments which control the management and disposition of those funds. That the union or pension fund may benefit from any such misappropriation does not alter this basic prohibition. The criminal provisions considered here were designed to prohibit the knowing disbursement of funds contrary to those strictures, and to this extent they go beyond traditional embezzlement statutes.

To the extent that the fact finders, either the jury (as to the codefendants) or the court (as in Andreen's case), considered whether the payments conferred a benefit to the pension fund as an element of the offense, rather than limiting its relevance to the defendants' state of mind, such consideration was unnecessary. The defendant was not, of course, prejudiced by the application of standards of criminal liability more strict than the statute requires.

2. Sufficiency of Evidence to Prove Pension Fund Embezzlement

Addressing the question whether, under the above principles, the payments from the pension fund constituted a statutory violation, we hold that a violation was established. Convictions under Section 501(c) have been upheld upon proof of unauthorized use of funds with fraudulent intent. *See, e. g., United States v. Nell, supra,* 526 F.2d 1223; *United States v. Goad, supra,* 490 F.2d 1158. That showing has been made here.

The pension trust, the largest of the funds which figured in the case and the fund in question under count 2, had assets exceeding $25,000,000 and 7,000 beneficiaries in 1976. The trust was administered by fourteen trustees, with equal representation from management and labor interests. The pension plan agreement provided for trustee compensation from the trust fund for services rendered. Trustee fees were recorded in the minutes of the monthly trustee meetings and disclosed in annual reports submitted to the Department of Labor and the Internal Revenue Service.

The pension trust was created in 1963. Although the trustees received modest compensation for attending trustee meetings, they tried repeatedly to obtain pensions for themselves, in their capacity as trustees. They solicited three legal opinions on the subject between 1965 and 1969. They received consistent advice that as trustees they were not "employees" of either the union or an employer so that their inclusion in pension benefits was not permitted; moreover, such a pension scheme would put the tax exempt status of the plan in jeopardy, and this was a further reason for rejecting the proposal. Article VIII § 10 of the pension agreement stated the trustees had the duty to preserve the tax exempt status of the fund under 26 U.S.C. § 401. Two of the legal opinions, including one co-authored by Andreen, mentioned the possibility of "deferred compensation or an alternative." One opinion explicitly stated, however, that such compensation, even if reasonable, could not legally include lifetime payments.

From 1962 until 1970, Andreen served as counsel for management trustees of the pension trust. After some equivocation, the board of trustees hired Andreen as the sole trust attorney in September 1970. The members immediately renewed their efforts to obtain pension coverage. One trustee indicated that trustees for a Los Angeles construction worker pension fund received pension benefits. The longhand minutes of the September meeting reflect Andreen's agreement to conduct further research in the area and to obtain rulings from the NLRB and the IRS. Reference to the IRS

ruling was deleted from the formal minutes on Andreen's instructions.[10]

On October 26, 1970, Andreen reported that he had contacted the attorney for the laborers' pension fund in Los Angeles. Contrary to prior information, the Los Angeles trustees had not awarded themselves pension credits. The plan had not been implemented because of an adverse IRS ruling. Andreen again suggested the possibility of "deferred compensation." It was at this meeting that all references in the formal minutes to trustee "pensions" were altered to read "deferred compensation."

As recorded in the minutes of the November 23, 1970, trustees' meeting, the trustees adopted the following "deferred compensation" plan:

1. Retroactive to date of Trust or later date on becoming a Trustee.

2. Vesting—five years.

3. Age 55, or disabled (can draw for life).

4. Rate = scale based on future service for pensioners, two times yearly amount.

5. Maximum credit—15 years.

6. Deferred compensation cannot be drawn while active as a Trustee on this Trust.

In essence, this plan provided payments to retired trustees for life with the benefits measured by the value of pension credits.[11] The trustees' plan was retroactive to the date an individual became trustee. Ostensibly, the plan was funded by the trustees' deferral of an increase in meeting fees from $60 to $100.[12] Thus, by forgoing an increased meeting fee of $40, the trustees would receive future benefits measured by the value of two pension credits. At the time the trustees' plan was adopted, the average laborer had to contribute $720 to receive two pension credits, while in contrast a trustee "deferred" but $480 [$40 times twelve months] for an equivalent benefit. This differential increased as the fund grew and the contribution rate for employees rose.

A retroactivity provision multiplied the amount trustees received without an accompanying remission of past meeting fees. The amount was not justified, even ostensibly, as bearing any relation to services rendered to the trust. One month after the plan's adoption, trustee Sam Brown retired. His fellow trustees approved lifetime payments of $168 per month under their newly enacted plan. By 1975 the value of benefits had risen to $420 a month for life. There was evidence that the trustees conferred benefits on themselves at a rate of one hundred to one in comparison to benefits received by the plan's legitimate participants. On January 25, 1971, the plan was amended to accord coverage to widows of trustees at 75% of their husbands' benefits.[13] In August, 1971, the plan was again amended to eliminate the minimum retirement age of 55.[14]

If disclosed, the compensation scheme would have disqualified the pension's tax exempt status, in direct contravention of the trust agreement. At the February,

10. Ray Ostergren, the trust administrator, prepared the minutes for the trustee meetings. He took longhand notes and then submitted typed minutes for trustee approval. Copies of Ostergren's handwritten notes and the formal minutes were introduced into evidence through several days' testimony of Mr. Ostergren.

11. For each hour worked by an "employee," a negotiated amount was contributed to the trust. In 1970, the hourly contribution was $.35. by 1975 it had risen to $1.47. For each 1,200 hours worked, a laborer was awarded one credit. After 15 credits had been accumulated, a laborer was eligible to retire at age 55. Monthly benefits were determined by multiplying the total credits by a value set by the trustees with the aid of an actuary. The value

determination considered: the contribution rate, estimated number of contribution manhours, anticipated return on investments, and the expected number of eligible retirees. In 1970 the value of a credit was $12.00. By 1975 it had reached $30.00.

12. There was evidence that $100 was a reasonable meeting fee.

13. Normal pension beneficiaries had to elect widows' benefits resulting in reduced lifetime benefits. In addition, widows were entitled to a 70% rate.

14. Employee pension beneficiaries were subject to a minimum age requirement of 55.

1971, meeting several trustees objected to segregating deferred compensation payments in financial reports. Thereafter, these payments to trustees were lumped with regular pension benefits in all financial reports. As to the initial five retiring trustees, the official minutes reflect trustee approval of payments. Thereafter, the trust administrator, who prepared the minutes, was directed not to refer to trustee payments therein.

Prior to the plan's termination upon return of the indictment, payments totalling $152,967.70 had been disbursed to twelve retired trustees. The pension trust agreement contained a general provision for compensation for services rendered as trustees.[15] The Government introduced sufficient evidence, however, from which a trier of fact could find that the trustees awarded themselves excessive and unauthorized lifetime payments in amounts that were so unreasonable that they were not in any proportion to actual services rendered. The payments, therefore, constituted misappropriations for personal purposes and were not compensation at all. Indeed, it is not vigorously asserted that the exorbitant compensation scheme reflected good faith estimates of reasonable payment for services rendered. In like circumstances the courts have sustained convictions for embezzlement. *United States v. Capanegro*, 576 F.2d 973 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978) (upheld conviction of attorney under 29 U.S.C. Section 501(c) for submitting bills which were not reasonable estimates of services rendered to union); *United States v. Vitale*, 489 F.2d 1367 (6th Cir. 1974) (upheld section 501(c) conviction, the validity of which turned on whether the union received fair market value in transaction with union officer). *See United States v. Johnson*, 596 F.2d 842 (9th Cir. 1979) (although severance pay authorized, violation of Section 501(c) to award excessive severance pay and to reimburse charges not incurred).

The Government's evidence exposed trustees channeling a flow of money from the fund they were supposedly monitoring. Violation of the statute cannot be condoned simply because it is accomplished by subtle or indirect means. *See United States v. Santiago, supra*, 528 F.2d at 1135; *United States v. Vitale, supra.*

### 3. Andreen's Individual Criminal Liability

We next discuss the individual criminal liability of Andreen. The evidence is adequate to establish all of the elements of a violation of section 664 by reason of the pension plan scheme, and we conclude as well that the evidence was more than sufficient to establish that Andreen was culpably involved with the criminal venture.

One who acts willfully and with the specific intent required for commission of the particular crime in order to further the criminal transaction may be properly convicted for its commission under 18 U.S.C. Section 2, which punishes as a principal one who aids or abets. *See United States v. McDaniel*, 545 F.2d 642, 644 (9th Cir. 1976). Criminal intent may be inferred from proof the actions were unauthorized or without benefit to the trust, or from evidence that transfers yielded personal profit to the trustees. *See United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975); *United States v. Dibrizzi*, 393 F.2d 642 (2d Cir. 1968). Andreen was not in a position to gain directly from the pension trustees' scheme. It is not necessary, however, that one have an active stake in the outcome of the crime. *United States v. Lane*, 514 F.2d 22, 27 (9th Cir. 1975). It is sufficient if Andreen acted with criminal intent to further the crime or that his purpose was to take part in its commission.

Proof of knowledge of the unauthorized nature of the taking can be inferred from attendance at meetings and knowledge of

---

**15.** Article 1 § 7 of the agreement provided:

The trustees, either individually or collectively, may receive compensation for services rendered as trustees from the trust fund, and shall be paid or reimbursed out of the trust fund for all expenses and costs incurred by them in performance of their duties as trustees.

the provisions of the trust agreement. *See United States v. Sullivan,* 498 F.2d 146 (1st Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974). Andreen knew of the plan from its inception. His disclaimer of advance knowledge regarding the operation of the plan is refuted by circumstantial evidence. He assisted in drafting the original pension agreement in 1963 and knew its restrictions. He attended trustee meetings at which the plan was discussed, adopted and implemented. He proffered the deceptive verbiage of "deferred compensation." He participated in the February 1971 meeting when the decision was made to treat the trustee payments identical to legitimate pensions for record keeping purposes.

Andreen acted as well to conceal the crime in order to further its ongoing commission. Concealment in financial reports is relevant when ascertaining knowledge. *See United States v. Silverman, supra,* 430 F.2d 106. The trustees were required to submit an annual report (D–2) to the Department of Labor. The D–2 form contains a schedule for trustee salaries and expenses. The relevant reports for the pension trust record only the $60 meeting fees as trustee compensation. The trustee expense column was left blank. Payments to retired trustees were commingled with pensions on the form, yet the trustees were not listed as "contributors" to the pension fund for their supposed $40 "deferral." This schizophrenic treatment is reflected throughout the minutes and in the financial records. Such inconsistencies belie the theory that the payments represented "deferred compensation or reasonable fees." At the direction of the trustees, trust financial reports lumped payments to trustees with those made to legitimate pensioners. Consistent with another directive, the minutes of trustee meetings do not refer to actions approving trustee payments or the amounts thereof even though such items were discussed.

Andreen's participation exceeded the bounds of mere presence at meetings wherein these actions occurred. On February 13, 1973, he authored a letter to retired management trustee Glenn Doudy, counseling him that it was legal to accept his "deferred" payments. Yet, it was Andreen who originally advised the trustees that they were ineligible for benefits as trustees. When an attorney for the Los Angeles laborers' fund inquired as to the mechanics of the plan, Andreen replied that the trustees were covered as "employees" of the union or of an employer's association. Andreen knew the composition of the Board and knew the trustees were receiving credits as trustees. Indeed, he informed a new trustee that a fellow trustee had accumulated so many credits from the trust "for being a trustee on those trusts." It stretches credulity to claim that Andreen did not know that the plan was unauthorized and did not act to further its implementation. The trial judge was justified in inferring that Andreen acted to aid and abet the violation, by counseling the trustees and concealing their actions from outside inquirers. His conviction on count 2 is therefore affirmed.

*Haning Disability Pension (Count 6B )*

The second substantive charge for which Andreen was convicted was for aiding and abetting one John Haning in an embezzlement. A different trust was involved in this offense.

In addition to the pension trust, Local 89 maintained a health and welfare trust and a vacation trust. Shortly after the pension trustees adopted their scheme for pensions (or deferred compensation), similar retirement coverage was demanded by trustees of these other two trusts. The efficacy of a retirement proposal for trustees of these other entities depended upon approval by the pension trustees, because the pension fund was the source of the benefits. Of the fourteen pension trustees, twelve also served on either or both the health and welfare and vacation trusts. On January 4, 1972, the pension trustees granted formal approval for additional pensions, whereby health and welfare trustees and vacation trustees received pension credits for their services as trustees, retroactive to their dates of appointment. As an additional feature, trustees of the vacation trust and the health and welfare trust were allowed

to *purchase* retroactive credits at the effective contribution rates for preceding years.[16] No refund of meeting fees already received was exacted in exchange for retroactive credits.

Total obligations and payments of $2,697,030.00 were distributed to thirteen trustees under this scheme. Ultimately, on June 29, 1972, Andreen advised the trustees to discontinue it. The trustees terminated acquisition of future credits, but they retained credits previously acquired. Although indicted for aiding and abetting this embezzlement scheme as a whole, Andreen was acquitted on the charge. He was convicted, however, for aiding and abetting Haning, a health and welfare trustee, in a specific manipulation of this particular compensation scheme.

Haning was a management health and welfare trustee who resigned his trusteeship, in January, 1972. Under the trustees "deferred compensation" or pension plan, benefits did not vest until accumulation of 25 credits or age 55, and Haning met neither test, having acquired only eighteen credits and not yet having attained age 55. The plan did permit early retirement in the event of disability, however. Once a beneficiary was certified as disabled, the pension was available without reference to age or the 25 credit requirement.

The Union pension plan defined "disability" as an inability to work as a craftsman in the construction industry. The definition was contoured, obviously, to the laborer beneficiaries of the trusts. Although Haning had never legitimately worked as a laborer, a doctor certified him as disabled under this standard. Haning submitted a disability application based on a false work history. The trustees approved the application, and Haning began receiving payments of $630 per month after November, 1974. Throughout this period Haning continued to work in a high level management position for one of the employers.

In May, 1975, McDonald, a new pension trustee, inquired of Andreen why Haning collected a disability pension while he was still working. Andreen responded that Haning met the pension plan definition of disability, in that he was unable to work in the construction industry as a laborer. Andreen argues that the aiding and abetting violation cannot stand because his advice was technically accurate and it was rendered after Haning had obtained his pension. We disagree.

It was established that Andreen knew that Haning had accumulated the pension credits. Andreen virtually conceded, moreover, that he knew the illegality of this practice. Even though Andreen was acquitted of aiding the health and welfare trustees' original acquisition of credits in 1972, his conviction for aiding Haning to continue extracting money ·from the fund after November, 1974, presents no inconsistency. The record allows the inference that Andreen's response to McDonald was composed with the intent to divert further inquiry. Thereby, Andreen assisted Haning in continuing to receive monies under the original acquisition of credits fraudulently acquired from the date of inquiry until the date of indictment. This constitutes an intentional assistance to further the illegal purpose of the criminal venture and renders Andreen liable for its commission. *United States v. Groomer*, 596 F.2d 356, 358 (9th Cir. 1979). We thus affirm Andreen's conviction on this count.

*Scripps Clinic Physical (Count 9)*

■ Andreen was convicted for obtaining a physical examination at the Scripps Clinic at the expense of the health and welfare trust. In 1973 the health and welfare trustees authorized expenditures of trust money for routine physicals for trustees and staff members on all trusts.[17] Andreen participated as a staff member, receiving services valued at $874, for which he was found guilty of embezzlement. We have sufficient doubt regarding Andreen's

---

16. Such an option was not available to regular pension participants.

17. Ordinary beneficiaries of the health and welfare plan were not entitled to reimbursement for *routine* physical examinations.

criminal intent with respect to this episode that we reverse the conviction. Andreen reported for a physical examination only after the plan administrator insisted several times that he do so, stating that the examination was required of all staff members. Andreen, moreover, was covered by several other health policies which would have provided reimbursement for the Scripps physical. We cannot say that on this record the Government has carried its burden of showing that Andreen took the examination with the requisite willful purpose required for conviction under 18 U.S.C. § 664. The conviction on this count is reversed.

*Conspiracy Charge (Count 1)*

Count 1 of the indictment charged Andreen and his trustee codefendants with conspiring to embezzle union trust funds in violation of 18 U.S.C. § 664 and the conspiracy statute, 18 U.S.C. § 371. The conspiracy count encompassed the deferred compensation plan of the pension trust, the retroactive credit plan of the health and welfare and vacation trusts, the physical examinations, and the practice of various trustees and of Andreen of receiving excessive and unearned reimbursements for trip expenses. While there is much other evidence to sustain the conviction of Andreen on this count, we need only refer to his activities in assisting the trustees to embezzle from the pension trust by means of deferred compensation, as previously detailed in connection with count 2.

The elements of a criminal conspiracy include: (1) an illegal objective; (2) an agreement between two or more persons to accomplish that objective; (3) one or more overt acts in furtherance thereof; and (4) the requisite intent. *United States v. Bailey*, 607 F.2d 237, 243 (9th Cir., 1979), *cert. denied,* 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980). The mental state required for the crime of conspiracy, generally speaking, is not less than that required for the substantive crime. *United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975). The unlawful object and existence of the agreement is adequate-

ly explained in our discussion of the evidence which supported the conviction under count 2.

As to proof of the third element, an overt act need not itself be criminal, as its only function is to demonstrate that the conspiracy is operative. *United States v. Buckner*, 610 F.2d 570 (9th Cir. 1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1646, 64 L.Ed.2d 235 (1980). Proof of the act must be established within the period of limitations. *Grunewald v. United States*, 353 U.S. 391, 396, 77 S.Ct. 963, 969, 1 L.Ed.2d 931 (1957). The applicable period is five years. 18 U.S.C. § 3282. Although the original indictment was returned in April, 1976, it was superseded on November 23, 1976. The trial court applied the November date to ascertain the applicable limitations period, without objection from the Government. The case was tried on the theory that the Government must establish at least one overt act in furtherance of the conspiracy between November 1971 and November 1976. During this period several trustees began receiving payments under the guise of deferred compensation. Andreen's own acts during this period indicate during 1973 he authored a letter to retired management trustee, Glenn Doudy, counseling him that it was legal to accept the "deferred" payments. Also, during this period there were concealments in the financial reports, and these too were overt acts in connection with the conspiracy, for part of the purpose was to conceal the existence of embezzlement so that the criminal scheme could remain active. This was not a case in which the principal object of the conspiracy had been accomplished by the time of concealment. *Cf. United States v. Green*, 594 F.2d 1227 (9th Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 108, 62 L.Ed.2d 70 (1979). During the applicable limitations period Andreen also advised health and welfare trustees to revert to their regular fee and forgo pension credits, but this was when they had already acquired sufficient credits to qualify. The advice provides an adequate basis to infer the overt act of concealment to further an active criminal enterprise. The point is

merely cumulative to Andreen's participation in the conspiracy relating to the pension trust.

Finally, the question of Andreen's knowing participation is hardly open to doubt. He attended numerous meetings and had intimate familiarity with the operations of each retirement and compensation plan. In reviewing the evidence in support of his count 2 conviction, moreover, we have already determined that Andreen acted with the specific criminal intent required for violation of section 664.

 Andreen's conviction for aiding and abetting in the pension trust embezzlement under count 2, does not bar his conviction for conspiracy to commit that same crime under count 1. *United States v. Chases*, 558 F.2d 912 (9th Cir. 1977), *cert. denied*, 434 U.S. 1036, 98 S.Ct. 771, 54 L.Ed.2d 783 (1978). We might add that the instant case provides a compelling example of the valid purpose behind the principle that a conspiracy is a separate substantive evil which justifies separate punishment. The existence of this conspiracy, with the defendants acting in concerted agreement, each playing his own part in the ongoing scheme to defraud, no doubt reinforced the criminal purpose of each of the others and strengthened the resolve to continue. *See generally Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961). Andreen's conviction for conspiracy on count 1 is affirmed.

*Procedural Rulings*

It remains to consider certain objections made by Andreen as to the conduct of the trial. Our evaluation of these objections, both individually and cumulatively, does not disclose any error.

1. Severance

 Andreen challenges the refusal of the trial court to sever his trial from that of his trustee codefendants. Andreen was the only nontrustee defendant on trial. He contends it was an abuse of discretion to deny a motion for severance under Fed.R. Crim. 14. For whatever reasons, Andreen, with the advice of counsel, chose to try his case to the court. We find no reason to question his strategic choice. The Government asserts that by his election, Andreen failed to preserve his objection regarding severance.

We need not decide whether the decision to try one's case to the court with a simultaneous jury trial for codefendants dissipates all objections to a joint trial, although there appears to be some merit to the Government's argument. Rather, we base our determination on the failure to show prejudice under the facts of the case. The moving party has the burden of proving clear, manifest, or undue prejudice from a joint trial. *United States v. McDonald*, 576 F.2d 1350, 1355 (9th Cir.), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978). Andreen's allegations of prejudice pertain to problems inherent in any joint trial.[18] He has failed to show any specific prejudice, and we therefore reject this ground of appeal.

2. Waiver of Findings of Fact

 The record affirmatively establishes that when Andreen waived a jury trial, he also waived special findings of fact. He claims nevertheless it was error for the court not to make special findings, and cites *Howard v. United States*, 423 F.2d 1102 (9th Cir.1970), as authority. *Howard* held that the trial court could not condition a jury waiver upon a waiver of special findings of facts. Neither the waiver form signed by Andreen nor the colloquy between Andreen and the court suggest such an impermissible condition here. No attempt was made to reserve the right to request special findings. The composite waiver form, containing waivers of both a jury trial and findings of fact, may be

---

**18.** Appellant must demonstrate more than the fact that a separate trial might offer him a better chance of acquittal. *United States v. Cella*, 568 F.2d 1266 (9th Cir. 1978). He must demonstrate that the evidence was incapable of compartmentalization as it related to each defendant. *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977).

subject to criticism but it is not per se improper. Unlike the situation in *Howard*, the waivers were independent and not conditioned, one upon the other. *See United States v. Masri*, 547 F.2d 932 (5th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

The written waiver was explicit: "The undersigned defendant further waives the right to request any special findings of fact as provided by Rule 23(c) of the Federal Rules of Criminal Procedure." Andreen, an attorney for 26 years, with the able assistance of counsel, signed the dual waiver form. He was subsequently questioned by the trial judge as to his understanding thereof and as to the voluntariness of his action. Under all the circumstances, we find Andreen entered an effective waiver of special findings.

### 3. Verdict

 Andreen challenges the decision of the trial court to hear the jury verdict as to his codefendants prior to completion of closing arguments in his case to the court. The judge instructed the jury on May 24, 1977, and they retired to deliberate. Counsel in Andreen's case began closing arguments on May 25th. At 3:00 p.m. that day the jury announced it had reached a verdict. The court convened counsel in Andreen's case and acknowledged the dilemma—whether to take the verdict or to defer until after a decision in Andreen's case. Ultimately, the judge read the jury verdict finding Andreen's codefendants guilty on all counts. Counsel then completed closing arguments in Andreen's case and the court returned its judgment of guilty on May 27th.

Andreen suggests various psychological theories to show prejudice, but he presents no evidence impugning the integrity of the judicial decision. He ignores, moreover, his affirmative participation in the timing of the verdicts. When the jury announced it had reached a verdict, the judge informed Andreen and counsel that he would not hear the verdict before rendering his decision in Andreen's case unless Andreen agreed to the procedure:

. . . the only way I will proceed to take this verdict under the circumstances would be if counsel for Mr. Andreen and Mr. Andreen . . . [would agree to] take this verdict before I render my decision. I wouldn't ordinarily do this, but I can only state for the record that it is a matter that is solely up to you. We can seal this verdict and wait until I have rendered my verdict, if you chose, take it and seal it. We can take it and read it in open court until I have reached my verdict. Or we can take it and read it in open court and then proceed with the trial, the court trial, . . . so, it's up to you gentlemen.

Upon inquiry, both Andreen and his counsel voiced no objection.

Finally, we note that the decision of the trial judge negates somewhat Andreen's arguments of undue influence. Andreen was acquitted on five of nine counts. The acquittals attest to the trial court's careful weighing of the testimony and the evidence on each count. *Cf. United States v. Capaneqro*, 576 F.2d 973 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

REVERSED as to count 9; AFFIRMED on all other counts.