**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hilda ESCOBAR DE BRIGHT, Defendant-Appellant.**

**No. 81–1648.**

United States Court of Appeals, Ninth Circuit.

Argued En Banc Jan. 12, 1984.

Resubmitted to Original Panel March 12, 1984.

Decided Sept. 18, 1984.

Daniel G. Knauss, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Robert Murray, Tucson, Ariz., for defendant-appellant.

Before FLETCHER, PREGERSON, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

After abolishing the long standing concurrent sentence doctrine, an en banc panel, 730 F.2d 1255, remanded this case to the original panel to decide the merits of the defendant's challenge to her conspiracy conviction.[1] We now hold that the district court committed reversible error in failing to instruct the jury that if it found that the defendant "conspired" only with a government agent she could not be found guilty of conspiracy. Accordingly, we reverse her conspiracy conviction.

Hilda Escobar de Bright was charged on counts of conspiring to import heroin (Count One), illegally importing heroin (Count Two), conspiring to possess heroin with intent to distribute (Count Three), and illegally possessing heroin with intent to distribute (Count Four), in violation of 21 U.S.C. §§ 963, 952(a), 960(a)(1), 841(a)(1)

(1982), and 18 U.S.C. § 2 (1982). She was convicted on all four counts and sentenced to concurrent six-year sentences. In Counts One and Three, Escobar de Bright was charged with conspiring with Ernesto Ayala-Zarate, Hector Ayala-Zarate, Ana Maria Zarate de Ayala, and others to import heroin in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and to possess heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

In April 1981, Ernesto Ayala-Zarate contacted Manny Banda, a paid informant for the Drug Enforcement Administration, about the purchase of heroin. Apparently, in that and a later conversation, Ernesto gave Banda the defendant's telephone number—one time so that Banda might approach Ernesto's brother, Hector, who is Escobar de Bright's son-in-law, and one time so that Banda might contact the defendant and solicit her assistance in importing heroin from Mexico. Banda arranged to meet the defendant and, after meeting her, persuaded her to drive immediately to Mexico. At trial, the defendant testified that she drove to Mexico only because she felt threatened by Banda and that she did not know that he planned to import heroin. After entering Mexico, she drove back across the border where her 17 year old son, Francisco, entered the automobile. Her car was later stopped by United States Customs Patrol officers. The officers searched Francisco and discovered four ounces of heroin.

Subsequently, Escobar de Bright and Ernesto and Hector Ayala-Zarate were named in the four count indictment. The jury found the defendant guilty on all four counts.[2]

---

1. In our initial opinion, we stated that the defendant challenged only her conspiracy conviction under Count One (conspiracy to import heroin) of the four count indictment. In reliance on our statement, the en banc court remanded the case so that we might decide the merits of the defendant's challenge to her conviction on Count One. Upon re-reading the briefs and carefully scrutinizing the record, we are forced to conclude that the defendant's arguments apply equally to her conviction under Count Three of the indictment (conspiracy to possess heroin with intent to distribute). Al-

though she did not specify which counts were being appealed, we find no basis for distinguishing between the two conspiracy counts. We therefore consider the defendant's objections as applying to her convictions on both Counts One and Three. For purposes of clarity and simplicity, we refer to defendant's convictions on those counts as the "conspiracy conviction."

2. Hector and Ernesto Ayala-Zarate were also convicted. Their convictions were affirmed in an unpublished memorandum. We do not set forth here the evidence that supported those

The defendant challenges her conspiracy conviction. She claims that the district court erred in refusing to instruct the jury that she could not be found guilty of conspiracy if the jury determined that she "conspired" only with the government agent, Manny Banda.[3] In response, the government argues that the jury instructions fully informed the jury of the law of conspiracy. We agree with the defendant.[4]

"A defendant is entitled to an instruction concerning his theory of the case if it is supported by law and has *some* foundation in the evidence." *United States v. Winn*, 577 F.2d 86, 90 (9th Cir.1978) (emphasis added); *see United States v. Falsia*, 724 F.2d 1339, 1342 (9th Cir.1983); *United States v. Wright*, 593 F.2d 105, 107 (9th Cir.1979); *United States v. Hall*, 552 F.2d 273, 275 (9th Cir.1977); *see also United States v. Sielaff*, 615 F.2d 402, 403 (7th Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) ("The general principle is well established that a criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him and which has 'some foundation in the evidence, "even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."'" (citations omitted)).[5] We have emphasized that failure to give such a requested instruction is *reversible* error. *United States v. Noah*, 475 F.2d 688, 697 (9th Cir.), *cert. denied*, 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973) (citing *Perkins v. United States*, 315 F.2d 120, 124 (9th Cir.), *cert. denied*, 375

U.S. 916, 84 S.Ct. 201, 11 L.Ed.2d 155 (1963)); *see United States v. Lyman*, 592 F.2d 496, 504 (9th Cir.1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2864, 61 L.Ed.2d 300 (1979); *Charron v. United States*, 412 F.2d 657, 660 (9th Cir.1969); *Baker v. United States*, 310 F.2d 924, 930 (9th Cir.1962), *cert. denied*, 372 U.S. 954, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963).

In *Sears v. United States*, 343 F.2d 139, 142 (5th Cir.1965), the Fifth Circuit Court of Appeals established the rule that, "as it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy." (citing *United States v. Wray*, 8 F.2d 429 (N.D.Ga.1925)). The Fifth Circuit held that, because the jury could have concluded from the evidence that the defendant conspired only with the government agent, the district court erred in failing to instruct the jury that it could find the defendant guilty of conspiracy only if it determined that he acted with the knowledge that persons other than the government agent were also involved in the illegal scheme. Accordingly, the Fifth Circuit reversed the defendant's conviction.

Two other circuits have explicitly adopted the *Sears* rule. *See United States v. Moss*, 591 F.2d 428, 434 n. 8 (8th Cir. 1979); *United States v. Chase*, 372 F.2d 453, 459 (4th Cir.), *cert. denied*, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967) ("[O]ne who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator.") (citations omitted). In ad-

---

convictions. Ana Maria Zarate de Ayala, Hector's and Ernesto's mother, was not indicted.

**3.** The defendant also contends that the district court erred in admitting testimony concerning statements made by a co-conspirator under Fed. R.Evid. 801(d)(2). Because we reverse her conspiracy conviction on other grounds, we need not address that argument.

**4.** The defendant's counsel—apparently in the judge's chambers—requested an instruction that the jury could not find the defendant guilty of conspiracy *if it concluded that she "conspired"* only with Banda, the government agent. This request is mentioned in a discussion between

counsel and the judge about the defendant's motion for judgment of acquittal, or, in the alternative, for a new trial; that motion was denied. In any event, the government does not allege that defendant's counsel did not submit the proposed jury instruction in the manner required by Fed.R.Crim.P. 30. We therefore need not consider whether the defendant met *the requirements of Fed.R.Crim.P. 30 in request-*ing the instruction.

**5.** Of course, the precise phrasing of the instruction is within the district court's discretion. *See, e.g., United States v. Rohrer*, 708 F.2d 429, 431 (9th Cir.1983); *United States v. Abushi*, 682 F.2d 1289, 1299 (9th Cir.1982).

dition, at least one other circuit has expressed the view that the *Sears* rule is correct. *See United States v. Barnes,* 604 F.2d 121, 161 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980) ("[T]he Government showed that [the defendant's] involvement was more far-ranging than simply having conspired with Government agents, for which no conspiratorial liability could be imposed."); *United States v. Rosenblatt,* 554 F.2d 36, 38 (2d Cir.1977). Until now, we have not considered the applicability of the *Sears* rule.

■■■ Strong considerations support the adoption of the *Sears* rule. A conspiracy is defined as an agreement between two or more people to commit an unlawful act, *see, e.g., Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975); *United States v. Falcone,* 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940); *United States v. Abushi,* 682 F.2d 1289, 1293 (9th Cir.1982); *United States v. Andreen,* 628 F.2d 1236, 1248 (9th Cir.1980), which arguably requires some form of a "meeting of minds," *Krulewitch v. United States,* 336 U.S. 440, 448, 69 S.Ct. 716, 720, 93 L.Ed. 790 (1949) (Jackson, J., concurring). There is neither a true agreement nor a meeting of minds when an individual "conspires" to violate the law with only one other person and that person is a government agent. The principle was explained concisely a quarter of a century ago:

> Since the act of agreeing is a group act, unless at least two people commit it, no one does. *When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone.* Although he may possess the requisite criminal intent, there has been no criminal act.

*Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 926 (1959) (emphasis added; footnote omitted) (hereinafter *Developments* ). In short, the formal requirements of the crime of conspiracy have not been met unless an individual conspires with at least one bona fide co-conspirator.

The rationale behind making conspiracy a crime also supports the *Sears* rule. Criminal conspiracy is an offense separate from the actual criminal act because of the perception "that collective action toward an antisocial end involves a greater risk to society than individual action toward the same end." *Developments, supra,* at 923–24 (footnote omitted); *see* W. LaFave & A. Scott, *Criminal Law* § 61, at 459–60 (1972). In part, this view is based on the perception that group activity increases the likelihood of success of the criminal act and of future criminal activity by members of the group, and is difficult for law enforcement officers to detect:

> For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered.

*United States v. Rabinowich,* 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211 (1915); *see, e.g., Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); *Developments, supra,* at 924–25; W. LaFave & A. Scott, *supra,* § 61, at 459.

■■ Such dangers, however, are non-existent when a person "conspires" only with a government agent. There is no continuing criminal enterprise and ordinarily no inculcation of criminal knowledge and practices. Preventive intervention by law enforcement officers also is not a significant problem in such circumstances. The agent, as part of the "conspiracy," is quite capable of monitoring the situation in order to prevent the completion of the contemplated

criminal plan; in short, no cloak of secrecy surrounds any agreement to commit the criminal acts.

Finally, the *Sears* rule responds to the same concern that underlies the entrapment defense: the legitimate law enforcement function of crime prevention "does not include the manufacturing of crime." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); *see Sorrells v. United States,* 287 U.S. 435, 452, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). Allowing a government agent to form a conspiracy with only one other party would create the potential for law enforcement officers to "manufacture" conspiracies when none would exist absent the government's presence.

■ We find the reasons underlying the *Sears* rule to be compelling and therefore adopt it here. Our inquiry, however, is not finished. Because we have decided that the defendant's requested instruction was supported by law, we now must decide whether there was "some foundation in the evidence" to support giving a *Sears* instruction in this case.

■ Here, the defendant's testimony is sufficient to support the giving of the re-quested instruction. Escobar de Bright testified that she did not know why Banda wanted her to go to Mexico but that, because she feared for her own and her son's safety, she felt coerced by him into going; the concern for her safety was based at least in part, she said, on her belief that Banda "might be wearing a gun." [6] She also testified that Banda "commanded" her son, Francisco, to go to Mexico. This testimony provides some support for Escobar de Bright's theory that she "conspired" only with the government agent Banda and did so only after he threatened her.[7]

In addition, there is testimony suggesting that Escobar de Bright would not have conspired with members of either of the Ayala-Zarate families. For example, her husband, Lorring G. Bright, testified that there was "bad blood" between Hector Ayala-Zarate and himself. In fact, Bright testified that he had previously shot Hector Ayala-Zarate. He also testified that his wife did not "get along" with Hector and that she often argued with Hector about her daughter (Hector's wife) and granddaughter. The defendant also testified to that effect. Finally, both the defendant and her husband testified that they had never met or spoken with another alleged

---

6. The following colloquy between the defendant and her counsel indicates her purported concern for her own and her son's safety:

   Q: Hilda, when you eventually went into Mexico, was [Banda] with you?
   A: Yes. He got into the back. He said let's go, and I'm going with you.
   Q: What did he tell you he wanted to go there for?
   A: He didn't tell me. In reality, he said something that sort of scared me and I accepted.
   Q: What did he say to you that scared you?
   A: He said well, you must accompany me to Mexico and so I went with him.
   Q: Had it not been for these things that he said to you, would you have put your kids in the car and gone down to Mexico?
   A: I would not have gone with him. But you see, I had my children with me, so I agreed to go with them or at least I dared to go with him.
   Q: Did you feel threatened by whatever this man said to you? ....
   A: Well, yes, because he threatened Francisco [her son] also.

   Q: What did he say to Francisco?
   A: That he had to go with him to Mexico to do something. That's all he said. And you, too, he said to me. So I did not want to allow him to go. I went along with him.
   Q: You mean you did not want Francisco to go by himself?
   A: No. I said to myself whatever happens to him it happens to me. Let's go and see what this guy wants.

7. Despite her testimony, the defendant did not request any instruction as to a defense of duress or coercion. Although her testimony might have provided some support for such a defense and although the defense of coercion or duress may be inconsistent with the theory that Escobar de Bright conspired with Banda, she did not offer an inconsistent defense here. We note, in any event, that the evidence supporting a proposed instruction as to a particular defense "may be weak, insufficient, *inconsistent* or of doubtful credibility." *United States v. Sielaff,* 615 F.2d 402, 403 (7th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) (citations omitted; emphasis added).

co-conspirator, Anna Maria Zarate de Ayala; in addition, there is no evidence suggesting that either of them had ever met Ernesto Ayala-Zarate.

We conclude that there was "some foundation in the evidence" to support the defendant's theory that she conspired only with a government agent. After carefully considering the instructions as a whole, *see United States v. Rohrer,* 708 F.2d 429, 431 (9th Cir.1983); *United States v. Abushi,* 682 F.2d 1289, 1299 (9th Cir.1982), we also must conclude that the jury could have followed those instructions and convicted the defendant of conspiracy even if it concluded that she had conspired only with the government agent. Accordingly, the district court erred in failing to give the jury the defendant's instruction.

As we noted earlier, we have consistently stated that if a defendant's theory of the case is supported by law, and if there is some foundation for the theory in the evidence, the failure to give the defendant's proposed jury instruction concerning his theory is "reversible error." We recognize that the cases that originally established this rule were decided before the Supreme Court created the "harmless" constitutional error category. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).[8] Although our decisions since *Chapman* have reiterated that failure to instruct the jury on the defendant's theory is reversible error,[9] we have never discussed the relationship between reversible error as used in those cases and the harmless error rule.

*Chapman* recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." 386 U.S. at 23, 87 S.Ct. at 827 (recognizing that the constitutional right to counsel, the right against admission in evidence of coerced confessions, and the right to an impartial judge require automatic reversal); *see United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 1980 n. 6, 76 L.Ed.2d 96 (1983); *Chapman,* 386 U.S. at 42, 43–44, 87 S.Ct. at 836, 837–838 (Stewart, J., concurring in the result); *United States v. Valle-Valdez,* 554 F.2d 911, 915 n. 6 (9th Cir.1977) (citing Supreme Court cases holding that "certain kinds of constitutional error require automatic reversal"; citations omitted); *see also Bagley v. Lumpkin,* 719 F.2d 1462 (9th Cir.1983) (government's failure to provide information requested by defendant pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), so that he could effectively cross-examine two important government witnesses required automatic reversal).

■ While "reversible error," from a strictly semantic standpoint, could mean reversible *"per se"* or reversible only if error resulted, or could have resulted, in some prejudice to the defendant, our cases must be read as meaning that a failure to instruct the jury on the defendant's theory of the case is reversible *per se*. The right to have the jury instructed as to the defendant's theory of the case is one of those rights "so basic to a fair trial" that failure to instruct where there is evidence to support the instruction can never be considered harmless error. Jurors are required to apply the law as it is explained to them in the instructions they are given by the trial judge. They are not free to conjure up the law for themselves. Thus, a failure to instruct the jury regarding the defendant's theory of the case precludes the jury from considering the defendant's defense to the charges against him. Permitting a defendant to offer a defense is of little value if the jury is not informed that the defense, if it is believed or if it helps create a reasonable doubt in the jury's

---

8. *Perkins v. United States,* 315 F.2d 120, 124 (9th Cir.), *cert. denied,* 375 U.S. 916, 84 S.Ct. 201, 11 L.Ed.2d 155 (1963); *Baker v. United States,* 310 F.2d 924, 930 (9th Cir.1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963).

9. *United States v. Lyman,* 592 F.2d 496, 504 (9th Cir.1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2864, 61 L.Ed.2d 300 (1979); *United States v. Noah,* 475 F.2d 688, 697 (9th Cir.), *cert. denied,* 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973); *Charron v. United States,* 412 F.2d 657, 660 (9th Cir.1969).

mind, will entitle the defendant to a judgment of acquittal.

We conclude that our cases—both before and after *Chapman*—stating that the failure to instruct the jury on the defendant's theory of the case is "reversible error" mean that the error can never be treated as harmless. We are not free to modify that rule; only the court *en banc* could do so. We would not change the rule, however, even if we had the opportunity, because any substantial modification of the rule would be inconsistent with fundamental constitutional guarantees. The conspiracy convictions under Counts One and Three of the indictment are

REVERSED AND REMANDED.