Filed 3/28/14  P. v. Yepez-Gutierrez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>AQUILES YEPEZ-GUTIERREZ,<br><br>    Defendant and Appellant. | F065208<br><br>(Super. Ct. Nos. CRF36211 & CRF36345)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Alex N. Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, William K. Kim and Tiffany J. Gates, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In a consolidated proceeding, defendant Aquiles Yepez-Gutierrez was convicted in a jury trial of possession of marijuana for sale (Health & Saf. Code,[1] § 11359) and cultivation of marijuana (§ 11358). At sentencing, the trial court placed defendant on probation for a term of five years and ordered him to serve a total of 180 days in jail.

On appeal, defendant contends the trial court erred by: (1) failing to instruct the jury on the lesser included offense of simple possession of marijuana; (2) failing to instruct the jury regarding a medical marijuana defense to possession for sale; and (3) failing to instruct the jury defendant's unrecorded statements must be viewed with caution. Additionally, he claims the prosecutor engaged in misconduct requiring reversal of the judgment. While we agree some claims of instructional error have merit, we find the errors harmless and affirm the judgment.

## FACTS

On July 26, 2011, Detective Eric Erhardt with the Tuolumne County Sheriff's Department served a search warrant in Groveland after he learned through aerial surveillance the property contained what appeared to be a large marijuana cultivation site. When he served the warrant, Hector Flores and Kyle Nelson were at the property. Officers discovered 252 marijuana plants planted in the ground, with some bearing different color tags, 27 plants in pots by the front of the house, and 17 additional plants inside a bathroom. The plants were immature, however, it appeared they were well maintained, and he expected they would produce marijuana buds in either late August or early September. Deputies also located a shotgun and two rifles in the home.

Marijuana recommendations for Nelson and defendant were posted outside as well as on bedroom doors inside the house. Nelson's recommendation was for 99 plants, while defendant's recommendation allowed for 100 plants. Additionally, each recommendation allowed the holder to possess 10 pounds of processed, dried, or extracted medical cannabis. Based on Erhardt's experience, these recommendations

---

[1] All further references are to the Health and Safety Code unless otherwise indicated.

appeared excessive as one person would not be able to use such large amounts of marijuana. In his experience a heavy user would use two to three grams a day which would translate into two to three pounds a year. Although he had heard of people smoking as much as four grams of marijuana in a day, he had not heard of such large amounts being used on a daily basis. Through investigations Erhardt determined it was quite easy to get a medical marijuana recommendation, and he is suspicious of recommendations allowing for such large quantities.

During his investigation, Erhardt called defendant to question him about the marijuana found at the Groveland property. Defendant relayed that he rented the Groveland property to cultivate marijuana, visiting every few weeks. He explained he had injured his knee and shoulder in an accident and uses the marijuana to ease his pain. He claimed he used 13 grams of marijuana per day. Erhard believed that amount was unreasonable as it would translate into approximately 26 marijuana cigarettes per day. In his experience he had never heard of anyone using such large amounts of marijuana on a daily basis. Defendant stated the marijuana was for his personal use only. Erhardt never questioned defendant regarding the different color tags on the plants.

Erhardt, an expert regarding marijuana cultivation and the possession of marijuana for sale, testified he expected the plants to yield approximately one pound of usable bud marijuana per plant. Given these yields, Erhardt believed the Groveland property was a commercial marijuana operation; therefore, he obtained a search warrant for defendant's home in Oakland.

Erhardt executed the search warrant on August 11, 2011. Defendant's home in Oakland is a two-story building with two addresses, one for the upstairs and one for the downstairs. Defendant lived at the 7412 address, which was the upstairs portion of the residence. The downstairs portion was listed as 7414. The home also contained a garage with a loft inside.

In the garage, deputies found what appeared to be a common area with couches. There was also a refrigerator and bathroom inside the garage. A search of the garage

revealed a large JOBOX storage box containing 10 large bags of marijuana as well as a five-gallon bucket filled with marijuana. In total, the JOBOX contained 11.5 pounds of marijuana. Medical marijuana recommendations for defendant as well as Nelson were posted on the inside lid of the JOBOX. Additionally, there were 73 marijuana plants in the garage, a suitcase containing one pound of processed marijuana, bank bags containing a total of five ounces of cocaine, a scale, two bulletproof vests, and a surveillance system. On the same shelf as the surveillance monitor was a medical recommendation for Octavio[2] Ramirez. On a desk near a starter tray for the marijuana seedlings was a notebook with defendant's name written on the front. Inside there appeared to be a fertilization schedule for the marijuana, a pay/owe sheet, and answers to common questions asked by law enforcement regarding the use of medical marijuana and how to justify the possession of large amounts of marijuana. There was another pay/owe sheet located underneath the stairs. Additionally, on top of the refrigerator beneath the stairs leading to the loft was a medical marijuana recommendation for Ruben Yepez,[3] defendant's brother, and a "toot" straw, used for ingesting narcotics.

It appeared someone was living in the loft area of the garage as it contained men's clothing and toiletries. Erhardt opined Ruben lived in the loft due to the men's clothing located there, and finding items in the other bedrooms in the home that appeared to belong to other individuals. Additionally, defendant's wife told the officer that defendant's brother lived in the garage.

Defendant lived in the upstairs residence with his wife and children. In the master bedroom, officers found shotgun shells. Inside the paneling of a Jacuzzi tub officers found $1,500 in cash. A search of the attic revealed a drying room for the marijuana,

---

[2]There are portions of the transcript that refer to Octavia Ramirez, but it appears the correct name is Octavio.

[3]We will refer to defendant's brother by his first name to avoid confusion. No disrespect is intended.

with strings strung across the ceiling and marijuana trimmings throughout the area. There was also a cigarette pack with a small amount of cocaine located inside in the attic.

Officers determined Nelson and Ramirez both lived in bedrooms in the downstairs portion of the residence. There was a third bedroom in the downstairs portion of the house that contained six pounds of processed marijuana and nothing else. In all, officers recovered 21 to 22 pounds of marijuana from the Oakland residence.

While officers were searching the Oakland residence, Octavio Ramirez arrived at the home. A search of his vehicle revealed $12,000 in cash in a cash box in the car. The money was composed solely of $20 bills. No one in the house claimed ownership of the money.

Defendant was not present during the search, however, officers noticed him drive by the home during the search. Defendant did not stop at his home and officers ultimately stopped him and took him into custody. Inside defendant's vehicle, officers found an additional five pounds of marijuana. The marijuana was packaged identically to the marijuana found in the JOBOX. Erhardt spoke to defendant about the items found in the home. In an unrecorded conversation, defendant told Erhardt the marijuana found in the house belonged to him and Nelson and was for their personal use. Erhardt confronted defendant with the large amounts of marijuana and the fact there was no evidence at the house to show he was eating or otherwise using the marijuana. Defendant then admitted he was unemployed and selling the marijuana to take care of his family. He grew the marijuana at the Groveland site. Specifically, he said he was selling to dispensaries as well as individuals, and he would sometimes receive over $2,000 per pound.

Defendant admitted the small amount of cocaine located in the attic was his, and he used the attic to process his marijuana for use. Defendant also admitted the $1,500 cash belonged to him.

Regarding the consumption of marijuana, Erhardt testified he was aware people can eat marijuana by making marijuana butter that is then used for cooking. He was not previously aware of people using bud marijuana to make butter, but later learned some

5.

recipes call for using bud marijuana. He was aware of a common recipe calling for one-half ounce of marijuana to every pound of butter, but agreed there were also recipes that used one ounce of marijuana for every pound of butter. Erhardt agreed that one who uses marijuana as an edible will require more marijuana than one smoking it. However, Erhard found no evidence of any marijuana edibles at either the Groveland or Oakland residences.

Receipts showing cash deposits into defendant's accounts were also recovered during the search. The receipts showed a $2,500 deposit in March, a $2,000 deposit in June, a $2,500 deposit in August and a $4,500 cash deposit on the day of the search warrant. Additionally, officers found a purchase contract dated the day of the search indicating defendant bought a truck and paid $4,000 in cash as a deposit. The contract was found in the garage. Erhardt also obtained defendant's bank records. The records showed a total of $17,000 in cash deposits between January and August. Defendant also deposited $7,000 in payroll checks made out to Nelson that had been signed over to defendant. Additionally, defendant's records showed he had deposited between $14,000 and $15,000 in unemployment checks during that time.

Based upon the amount of marijuana found in the home, the number of plants, the pay/owe sheets, scales, packaging material, and defendant's statement, Erhardt opined the marijuana was possessed for sale. The parties stipulated the cocaine and marijuana had been tested by a qualified expert and were confirmed as cocaine and marijuana.

*Defense Case*

Christopher Conrad testified as an expert regarding marijuana cultivation, yields, and consumption. He opined the typical marijuana plant only produced about four ounces per plant, not the one pound testified to by Erhardt, although he was aware of instances where plants produced up to five pounds of marijuana. In his experience a novice grower would typically have a smaller yield than the four-ounce average from the plants. Based upon the estimated height of the plants Erhardt observed at the Groveland

6.

site, Conrad opined the plants would only produce about two and one-half ounces of marijuana per plant.

Regarding consuming marijuana, Conrad testified one has to consume three to five times more marijuana when it is used for cooking to achieve the same effect as smoking marijuana. A typical medical marijuana patient uses about three to four grams of marijuana per day. Conrad opined a heavy user would use about 12 grams of marijuana a day, which translates to about 12 pounds a year. At that rate, one would eat rather than smoke the marijuana. Upon looking at pictures of how the marijuana was packaged in this case, it would have to be consumed within a year. Looking at some of the marijuana seized in this case, he opined it was midgrade and would best be used for cooking rather than smoking.

Parto Karimi, M.D., wrote the medical marijuana recommendation for defendant after seeing him and reviewing his medical records. Defendant complained about knee and shoulder pain from prior construction accidents and stated other treatments failed to reduce his pain. In her consultation with defendant, she learned he ate the marijuana by making marijuana brownies. Based on what he stated he used, she provided him the recommendation for 100 plants and 10 pounds. Dr. Karimi calculated defendant consumed approximately five pounds of marijuana per year, but learned he had only a 50 percent success rate in growing his marijuana, so she prescribed him 10 pounds so that he would be able to cultivate enough for his medical needs. In her opinion, she felt the recommendation was appropriate.

Dr. Karimi also wrote the recommendation for Ruben. She was surprised to learn defendant had a previous medical marijuana recommendation from another doctor for a much smaller amount. Dr. Karimi also wrote the medical marijuana for Nelson and Ramirez, and did not previously know they were all living in the same household.

Defendant testified he had injured his shoulder and knee in separate construction accidents over 10 years ago. As a result, he has had pain he has been unable to manage with other medications such as ibuprofen or Vicodin. He discovered medical marijuana

7.

works the best to manage his pain. He had a previous recommendation for medical marijuana but found it was insufficient for his needs. He consumed the marijuana by making marijuana butter and also used a vaporizer. When making the butter, he used four ounces of marijuana for every pound of butter. He tried using less, however, it did not manage his pain. There was no evidence of any marijuana edibles at his home because he makes all of his marijuana butter at his neighbor's house to keep it away from his children and wife. Although he has been using marijuana since 2005, he does not believe his wife knows about his cultivation or use of marijuana.

Defendant admitted to cultivating marijuana at the Groveland site, but stated only 80 of the plants were his. His were marked with orange tags. He had approximately 20 more plants in pots he would use to replace dead plants or those eaten by animals. The other plants at the site belonged to Nelson, Francisco Ramirez, and his brother. They each had recommendations for approximately 99 plants, therefore all of the marijuana at the site was within their recommendations.

Defendant lived in the upstairs portion of the Oakland address with his wife and children. His brother Ruben lived in one of the downstairs bedrooms as did Nelson and both Octavio and Francisco Ramirez. Hector Flores was living in the garage. His brother paid $500 a month in rent, but moved out in August, just before the search warrant was served at the Oakland house. Ruben went to live with his girlfriend, but still paid defendant rent for the month because he had failed to provide adequate notice. Ruben ended up moving back into the Oakland house shortly after the search warrant was served. Nelson paid $750 in rent, Octavio Ramirez paid $750 in rent, and Francisco Ramirez paid $500. Defendant was unsure if Flores paid rent because he was subletting from the Ramirez brothers. Flores subsequently went back to Mexico.

Defendant denied any of the marijuana at the house belonged to him; he only possessed the five pounds found in his car. He was taking his marijuana to a laboratory to be tested for mold. He had previously stored it in the attic. That was also where he dried and processed his marijuana.

Defendant did not have a key to the garage and denied using the garage since Flores moved in. Defendant did not know how his marijuana recommendation got inside the JOBOX, but opined he had placed it there before Flores moved into the garage and forgot to remove it. Defendant did not know how his contract for the vehicle he purchased the day of the warrant got into the garage. He opined he had left it on the patio and someone put it inside. The notebook with his name on it did not belong to him, and he was unsure if he wrote his name on it or if it was his handwriting. However, the writing inside of the book was not his. The plants found at the house belonged to Nelson.

Regarding the deposits he had made over the last several months, defendant stated he received money from unemployment and also received $14,000 in side jobs for cash. He also received $29,500 in rent and withdrew $7,000 from his pension plan. Defendant never reported the money he received from his side jobs to the unemployment office and did not know why his tax returns indicated he received $18,000 in rent. He claimed he provided his accountant with the total amount he received in rent and from the jobs he did for cash.

Defendant denied ever selling marijuana and testified the five pounds belonging to him was for his personal use. Defendant denied ever telling Detective Erhardt he was unemployed or that he was selling marijuana. Defendant denied Ruben lived in the garage, and he could not explain how Ruben's recommendation got into the garage.

Ruben testified he lived in one of the downstairs bedrooms at the Oakland house. Although he had been living in the room where the six pounds of marijuana was found, that was not his marijuana, and he had moved out prior to the search warrant. Despite the fact he moved out in early August, Ruben paid rent for the month because he failed to give his brother notice before moving out. None of the marijuana at the home belonged to him. He obtained a marijuana recommendation to help with lower back pain from a car accident. He received his marijuana recommendation in 2011 and had never used marijuana before that time. After getting the recommendation he began smoking three

9.

grams of marijuana per day using a vaporizer. He did not know how his medical marijuana recommendation got into the garage.

Regarding the Groveland site, Ruben was growing plants there as well. His recommendation was not posted because it had gotten water damaged, so he removed it to get it laminated.

On rebuttal, Detective Erhardt testified he did not find any vaporizers at either the Oakland or Groveland sites. In his experience, he had never heard of anyone using four ounces of marijuana to make marijuana butter. Additionally, he found no indicia in the garage belonging to Flores.

## DISCUSSION

### I.   The Failure to Instruct on the Lesser Included Offense of Simple Possession Was Harmless

Defendant argues the trial court erred in failing to instruct the jury with the lesser included offense of simple possession of marijuana. We agree.

The principles regarding a trial court's sua sponte duty to instruct on a lesser included offense are well settled. "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could … conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid.*) In assessing whether the evidence discloses substantial evidence of a lesser included offense, the court should not consider the credibility of witnesses, leaving that task for the jury. (*Ibid.*; *People v. Elize* (1999) 71 Cal.App.4th 605, 615.)

10.

Simple possession of a controlled substance is a lesser included offense of possession for sale of the same controlled substance. (*People v. Oldham* (2000) 81 Cal.App.4th 1, 16; *People v. Douglas* (1987) 193 Cal.App.3d 1691, 1696; *People v. Saldana* (1984) 157 Cal.App.3d 443, 454-455.) Here there was sufficient evidence to support a finding defendant possessed the marijuana for personal use rather than sales. Indeed, defendant testified the sole purpose in possessing the marijuana was for his personal medical use. Although approximately 20 pounds of marijuana was found throughout the Oakland residence, defendant denied possession of all but the five pounds found in his vehicle. Defendant denied he had access to the marijuana located in the garage and throughout the house and further denied the pay/owe sheets belonged to him. Furthermore, defendant had a recommendation for medical marijuana, and Dr. Karimi calculated defendant consumed approximately five pounds of marijuana per year based upon his reported usage. The defense produced additional evidence through Conrad regarding marijuana consumption and the higher amounts necessary for consuming marijuana in edibles.

Considering the evidence in this case, it is clear there was substantial evidence supporting the defense theory that defendant possessed the marijuana not for sale but for his personal use. Therefore, the trial court had a duty to instruct the jury on the lesser included offense of simple possession.

Defendant contends the trial court's failure to instruct on the lesser included offense deprived him of due process and therefore should be assessed under the standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24. In support of this argument, he cites *United States v. Escobar De Bright* (9th Cir. 1984) 742 F.2d 1196. We find defendant's argument unpersuasive.

In *Escobar De Bright*, the defendant was charged with conspiracy to possess heroin with the intent to distribute. There was evidence produced at trial that would have supported a finding the defendant conspired solely with a government agent. The court determined that conspiring solely with a government agent would not constitute a

11.

conspiracy as conspiracy requires at least two people who intend to violate the law. (*United States v. Escobar De Bright*, *supra*, 742 F.2d at pp. 1198-1200.) Therefore, the defense presented evidence which would allow the jury to find the defendant did not engage in a conspiracy. (*Id*. at pp. 1200-1201.) Importantly, the court noted that after "carefully considering the instructions as a whole, … we also must conclude that the jury could have followed those instructions and convicted the defendant of conspiracy even if it concluded that she had conspired only with the government agent." (*Id*. at p. 1201.) After explaining the "right to have the jury instructed as to the defendant's theory of the case is one of those rights 'so basic to a fair trial' that failure to instruct where there is evidence to support the instruction can never be considered harmless error," the court applied a reversible per se standard. (*Id*. at pp. 1201-1202.)

*Escobar De Bright* is inapposite. That case did not address the failure to give a lesser included offense instruction. There, the defense presented substantial evidence of a theory that would support an acquittal, but upon which the jury was not instructed. That is not the case here. Unlike the jury in *Escobar De Bright*, the jury here could not have followed the instructions and still convicted defendant of possession for sale even if it believed the defense that he possessed the marijuana for his personal use. The defense theory was that defendant was not guilty because he had no intent to sell the marijuana; it was only for his personal use. But the jury was explicitly instructed that in order to convict, it had to find the defendant possessed the marijuana for sale. It was further instructed its findings must be made upon proof beyond a reasonable doubt.

Thus, the issue here is the failure to instruct the jury with a lesser included offense. In *People v. Breverman*, *supra*, 19 Cal.4th at pages 165-176, our Supreme Court addressed the proper standard of review for the failure to instruct with a lesser included offense. In explaining the court's duty to instruct sua sponte on all lesser included offenses, the court noted the rule avoids an unwarranted all or nothing choice for the jury, and ensures a verdict no harsher or more lenient than the evidence merits. (*Id*. at p. 155.) The court analyzed the proper standard of review when a trial court failed to instruct on a

12.

lesser included offense in noncapital cases and found the error is "at most, an error of California law alone" and subject to the *People v. Watson* (1946) 46 Cal.2d 818 standard of reversibility. (*People v. Breverman*, *supra*, at p. 165.) We are, of course, bound to follow our high court in this regard. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In assessing whether an error is prejudicial under state law, we ask whether there was a reasonable probability of a more favorable verdict absent the error. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) In the context of failing to give an instruction on a lesser included offense, we may consider whether "the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 177.) Using this standard, we conclude the error was not prejudicial.

Although the evidence was conflicting, there is no reasonable probability a properly instructed jury would have come back with a more favorable verdict. Here the evidence of possession for sale was overwhelming. Defendant admitted to possessing the five pounds of marijuana in his vehicle. In addition there was an additional 11.5 pounds of marijuana in the garage of the home defendant owned. Although defendant denied he had access to the garage, the marijuana was found in a box with his recommendation taped to the lid. Moreover, the marijuana in the box was packaged identically to the marijuana found in defendant's vehicle. The purchase contract for the vehicle defendant bought that very morning was also located in the garage. The officers located a pay/owe sheet in a notebook bearing defendant's name on the front cover, as well as bulletproof vests and a surveillance system in the garage. This evidence strongly supports the finding that defendant had possession of the marijuana in the garage.

Defendant's bank records indicated several large cash deposits even though defendant was unemployed at the time. Defendant claimed he had received some of the money from jobs he performed, but provided no receipts for the work nor was the income

13.

reported on his tax return. Defendant also claimed he received over $29,000 in rent, however his tax returns reflected a substantially smaller amount. In addition, there was no evidence of any marijuana edibles or vaporizers found anywhere in either the Oakland or Groveland sites.

Furthermore, the jury rejected defendant's medical use defense as to the cultivation count. Although the evidence of the two charges was based on somewhat different evidence, the defense was identical: all the marijuana possessed or cultivated by defendant was for his personal use. In addition to the five pounds of marijuana defendant admittedly possessed, defendant further admitted cultivating at a minimum 80 additional plants that would become mature within the following month. By Erhardt's testimony, each plant at the Groveland site could produce up to one pound of marijuana. Even using Conrad's conservative estimate that the plants at the Groveland site would only produce 2.5 ounces per plant, the plants would produce another 12.5 pounds of marijuana. Using the four ounce per plant quantity that Conrad opined applied to most plants, and which was also the basis of a federal study, defendant's 80 plants would have produced an additional 20 pounds of marijuana. Thus, defendant expected to produce a very significant amount of marijuana in the next month.

When the overall strength of the greater offense is relatively strong and the evidence of the lesser is comparatively weak, we can say there is no reasonable probability of a more favorable outcome. Such is the situation here.

## II. The Trial Court Was Not Required to Instruct the Jury Regarding a Potential Defense to Possession of Marijuana For Sale on Its Own Motion

Defendant argues the trial court erred in failing to instruct the jury the Medical Marijuana Program Act (MMPA) (§ 11362.7 et seq.) provided a defense to the possession for sale charge. We disagree.

Initially, we note defendant never requested any instructions pursuant to the MMPA regarding the possession for sales charge. Rather, the prosecution moved in limine to exclude at trial any evidence of the Compassionate Use Act of 1996 (CUA)

14.

(§ 11362.5) and the MMPA, arguing the defenses provided for in those sections did not apply to this case. Defendant countered the defense was applicable because the cultivation charge did not indicate sales, and the amount possessed in the possession for sale charge was within the amount authorized by defendant's medical marijuana recommendation. Defendant never argued he was immunized from selling marijuana in any way. Instead, his defense at trial was that he never intended to sell the marijuana he possessed, he only possessed a portion of the total marijuana found at the house, and what he possessed was solely for his personal use. During the instruction conference, the court indicated it would give CALCRIM No. 2352 defining the crime of possession for sale. Defendant never objected to the instruction nor requested a specific instruction regarding any defense to the possession for sale charge.

On appeal, defendant claims the MMPA provides an affirmative defense to possession of marijuana for sale. Specifically he argues "personal possession of medical marijuana is a defense to prosecution for possession of marijuana with intent to sell." We find no error.

California voters adopted Proposition 215, the CUA, allowing, as relevant here, seriously ill patients the "right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana." (§ 11362.5, subds. (a) & (b)(1)(A).) Further, the CUA has the purpose of ensuring "that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction." (§ 11362.5, subd. (b)(1)(B).) The CUA only provides a limited defense to prosecution for the simple possession or cultivation of marijuana. (§ 11362.5, subd. (d); *People v. Mower* (2002) 28 Cal.4th 457, 470-474; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 774.)

Subsequently, the Legislature enacted the MMPA to "address issues not included in the [CUA], so as to promote the fair and orderly implementation of the [CUA] and to

15.

'[clarify the scope of the application of the [CUA].'" (*People v. Mentch* (2008) 45 Cal.4th 274, 290.) The MMPA "immunize[d] from prosecution a range of conduct ancillary to the provision of medical marijuana to qualified patients. (§ 11362.765.)" (*Ibid.*) Specifically, section 11362.765 provides:

> "(a) Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570. However, nothing in this section shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, nor shall anything in this section authorize any individual or group to cultivate or distribute marijuana for profit. [¶] (b) Subdivision (a) shall apply to all of the following: [¶] (1) A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use. [¶] (2) A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes, in amounts not exceeding those established in subdivision (a) of Section 11362.77, only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver. [¶] (3) Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person."

Defendant claims this provision provided him with a defense to the possession of marijuana for sale charge in this case and required the trial court to instruct the jury as to this defense. We need not decide whether the MMPA provides a defense under the present circumstances as defendant never relied on such a defense at trial. In fact, such a defense was inconsistent with his defense theory at trial. The clear issue at trial was whether defendant possessed the marijuana for the purpose of sales or whether the amount of marijuana he possessed was for his personal medical use. Defendant specifically refuted at trial that he possessed any of the marijuana for purpose of sale. Thus, defendant sought to negate an essential element of the charged crime, namely, that he possessed the marijuana with the intent to sell. He never relied on the CUA or the MMPA as an affirmative defense to immunize his possession of the marijuana *with the*

16.

*intent to sell*. The distinction is crucial in a case such as this where the defense argues the trial court erred by failing to give an instruction sua sponte.

In *People v. Anderson* (2011) 51 Cal.4th 989, 996-999, our Supreme Court held trial courts do not have a duty to instruct sua sponte on the defense of accident even if substantial evidence supports that instruction, provided the jury is properly instructed on the mental state element of the charged crime. This is because the defense of accident serves only to negate the mental state element of the charged crime, therefore, it is not the type of defense that invokes a court's sua sponte instructional duties. (*Ibid*.)

The court explained:

"'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to '"instructions on the defendant's theory of the case, including instructions 'as to defenses "'that the defendant is relying on …, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'"' [Citation.] But '"when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request.'" (*People v. Saille* (1991) 54 Cal.3d 1103, 1117.)" (*People v. Anderson*, *supra*, 51 Cal.4th at pp. 996-997.)

In *People v. Saille*, the court addressed whether a trial court was required, sua sponte, to instruct the jury that it could consider the defendant's voluntary intoxication in determining whether he had premeditated and deliberated a murder. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1117.) The court answered the question in the negative, explaining that voluntary intoxication was relevant only to negate the specific mental state required for premeditation and deliberation. (*Id*. at p. 1118-1120.) As such, it was incumbent upon the defendant to request an instruction pinpointing his defense. (*Id*. at p. 1120.) Likewise, in *People v. Jennings* (2010) 50 Cal.4th 616, 674-675, the court found the trial

17.

court had no sua sponte duty to instruct on accident as a defense to first degree premeditated murder, as the defense amounted to a claim that the defendant lacked the intent to commit the charged crime.

Similarly here, in arguing the MMPA is a defense to the charge of possession of marijuana for sale, defendant is attempting to negate an element of the offense. At trial, defendant testified he never harbored the intent to sell the marijuana. While he admitted possessing some of the marijuana, he claimed it was all for his personal use. He denied he had access to the garage where the majority of the marijuana was found, claimed he had no knowledge of the presence of that marijuana, and denied ownership of the pay/owe sheets and other items indicative of sales found in the garage. Furthermore, he denied ever making any statements that he intended to sell any of the marijuana and provided explanations for the numerous cash deposits he had made into his bank accounts. Thus, the issue clearly before the jury was defendant's intent in possessing the marijuana.

Indeed, the closing arguments focused on whether the marijuana was possessed for sale. There was never an argument by the defense that defendant was selling the marijuana but was somehow immunized by the CUA or MMPA. Defendant argued the "cultivation in Groveland, then, that possession of the marijuana if you find for personal use, then that possession in Oakland is still for personal use and not for sale, is still lawfully possessed."

Likewise, the prosecutor's arguments assumed if defendant possessed the marijuana for his personal use, no crime was committed. She began her closing argument by stating, the "first that we know of through testimony and law is that sales or possession for sales of any kind does not have any affirmative defense in the State of California. So, if you're possessing the marijuana for anything other than your personal medical use, you are outside the law and the Compassionate Use Act does not apply at all." Although the prosecutor then argued the possession for sales charge had no defense under the CUA, she explained, the CUA did not apply because defendant was

18.

"possessing this marijuana not for [his] personal use." The entire closing argument by the prosecutor was focused on the evidence demonstrating the marijuana was both cultivated and possessed for sales rather than for personal use. The prosecution's theory was defendant's medical marijuana recommendation was a sham, and defendant was using the recommendation to hide his commercial marijuana operation.

Further, we note defendant was not precluded from or limited in any way in presenting his defense to the jury. Defendant was allowed to produce evidence of both his medical marijuana recommendation and his pattern of usage. Furthermore, the jury was instructed, in association with the cultivation count, that

> "*Possession* or cultivation of marijuana is lawful if authorized by the Compassionate Use Act. The Compassionate Use Act allows a person to *possess* or cultivate marijuana for personal medical purposes when a physician has recommended such use. The amount of marijuana *possessed* or cultivated must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to *possess* or cultivate marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this crime." (Italics added.)

The jury was properly instructed on the elements of possession of marijuana for sale. Defendant never requested an instruction pinpointing his defense that evidence of his medical use of marijuana could be used to negate an inference he possessed the marijuana for sale. However, given the evidence in the case and the arguments presented to the jury, which focused on whether the evidence showed his intent to sell, the jury hardly could have missed the point. As his defense was an attempt to negate an element of the charged crime, it was incumbent upon defendant to request a pinpoint instruction highlighting the defense. (*People v. Anderson*, *supra*, 51 Cal.4th at pp. 996-999; *People v. Saille*, *supra*, 54 Cal.3d at pp. 1118-1120; *People v. Jennings*, *supra*, 50 Cal.4th at pp. 674-675.) Therefore, we find the failure to instruct on the defense absent a request for a pinpoint instruction was not error.

19.

**III.     The Failure to Instruct the Jury With Cautionary Language Was Harmless**

Defendant contends the trial court's failure to instruct with the cautionary language of CALCRIM No. 358 was prejudicial error.  Plaintiff concedes the error, but argues the error was harmless.  We accept plaintiff's concession and agree the error was harmless.

A trial court is required, sua sponte, to instruct the jury to view a defendant's oral admissions or confessions with caution pursuant to CALCRIM No. 358 when the evidence warrants.  (*People v. Dickey* (2005) 35 Cal.4th 884, 905.)  At trial, Detective Erhardt testified defendant had admitted selling the marijuana he possessed, and he admitted possession of the marijuana "at the house" belonged to defendant and Nelson for their personal use.[4]  These statements were unrecorded; therefore, an instruction pursuant to CALCRIM No. 358 was required.

The trial court instructed the jury as follows:

> "You have heard evidence that the defendant … made oral statements before the trial.  You must decide whether the defendant made such statements in whole or in part.  If you decide the defendant made such statements, consider the statements along with all the other evidence in reaching your verdict.  It is up to you to decide how much importance to give to the statements."  (See CALCRIM No. 358.)

The trial court failed to instruct the jury with an optional paragraph that provides: "Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."  (CALCRIM No. 358.)  This admonition was required in this case, as the statements at issue were not recorded in any manner.  Therefore, we agree the trial court erred in failing to instruct the jury with the cautionary language.

---

[4]Defendant also notes several other statements recounted by the detective regarding the rate of defendant's consumption of marijuana and how he received his injury.  These statements, although statements by defendant, were not material to the case, nor were they admissions, therefore, we need not address them.

20.

A court's failure to instruct the jury with the cautionary language of CALCRIM No. 358 is harmless where it is not reasonably probable the defendant would have received a more favorable verdict had the jury been properly instructed. (*People v. Dickey*, *supra*, 35 Cal.4th at p. 905; *People v. Beagle* (1972) 6 Cal.3d 441, 455.) "In assessing potential prejudice, we stressed that the primary purpose of the cautionary instruction 'is to assist the jury in determining if the statement was in fact made.'" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 94, quoting *People v. Beagle*, *supra*, at p. 456; cf. *People v. Bemis* (1949) 33 Cal.2d 395, 400 ["The cautionary instruction that evidence of oral admissions is to be viewed with caution is designed to aid the jury in determining whether an admission or confession was in fact made"].) Failure to give a cautionary instruction is harmless where there is no conflict in the evidence about the exact words used, their meaning, or the accuracy of the reporting of the admission and the defendant simply denies making the statement. (*People v. Dickey*, *supra*, at pp. 905-906.)

As to defendant's statement that he admitted selling the marijuana to dispensaries, there was no dispute as to the meaning or accuracy of the statement. Defendant simply denied ever making such a statement. Likewise, as to the statement defendant admitted possessing the marijuana in the house; the dispute was whether the statement was in fact made. Defendant, through cross-examination, questioned whether the admission was ever made or whether the deputy simply assumed he admitted possession from the other evidence.

In light of the evidence as a whole, we find the error harmless. Defendant emphasized throughout cross-examination and during closing argument that the statements attributed to him regarding the admission of possessing the marijuana for sales and the admission that the marijuana in the house belonged to him were not recorded. There was no dispute as to the meaning of the statements, and defendant never denied telling Erhardt the marijuana in the house belonged to him, although he testified at trial he had no knowledge of the marijuana in the garage. Defense counsel questioned whether defendant ever admitted to possessing the marijuana in the house through cross-

examination, however, he simply questioned whether any such statement was ever made. The issue, as emphasized by defense counsel through his closing argument, was whether the statements were ever made. Although counsel implied the statements were not accurately reported, no evidence of a different statement was produced. Thus, the issue of whether the statements were made was squarely in front of the jury.

Moreover, in assessing prejudice, we look to the other instructions given to the jury. Here, the jury was instructed it was to determine whether the statements were ever made. Furthermore, the jury was fully instructed regarding how to evaluate the testimony of witnesses. The jury was instructed with CALCRIM No. 226 regarding credibility and believability of witnesses; No. 301 instructed the jury to carefully review the evidence before determining the testimony of a single witness proved a fact; No. 302 explained how to evaluate a conflict in the evidence; and No. 318 instructed how to evaluate a witness's prior statements. Given these instructions, the jury was apprised of how to evaluate the statements.

Moreover, other evidence corroborated defendant's purported admissions. The marijuana in the garage was located inside a box with defendant's medical recommendation posted on the inside lid, the purchase contract for the vehicle defendant bought that very day was located inside the garage as was a notebook bearing defendant's name with pay/owe sheets inside. The marijuana located in the garage was packaged identically to the marijuana located in defendant's vehicle, and defendant's bank records reflected several large cash deposits in the preceding months. The evidence against defendant was overwhelming, even absent defendant's admissions. Based on this record, we cannot say there is a reasonable probability defendant would have received a more favorable outcome had the jury been instructed to view his statements with caution.

## IV.    Any Prosecutorial Misconduct Was Harmless

Defendant argues the prosecutor made several statements misstating the law at trial that constituted prosecutorial misconduct. We disagree.

22.

Section 11362.77, subdivision (a) provides a "qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient." In *People v. Kelly* (2010) 47 Cal.4th 1008, 1049, our Supreme Court invalidated this provision to the extent it prevented a qualified patient from asserting "as a defense in court, that he or she possessed or cultivated an amount of marijuana reasonably related to meet his or her current medical needs [citation], without reference to the specific quantitative limitations specified" in section 11362.77. Defendant argues the prosecutor's references to the quantity limitations in this section during trial constituted misconduct.

*Background*

During cross-examination of Dr. Karimi, the prosecutor asked if she was aware of "what the law says that if a patient is going to exceed the state guidelines, right, that they can only possess an amount that's—" At this point, the defense objected, and at a sidebar conference, the court instructed the prosecutor to "stay away from 11362.77" as the state guidelines could be unconstitutional to the extent they limit the defense.

Subsequently, Dr. Karimi testified she made a mistake in recommending 100 plants for defendant. This was because the federal guidelines called for recommendations of less than 100 plants. The prosecutor then asked Dr. Karimi if she knew what the default state guidelines were and defendant objected. The objection was sustained and the court instructed the prosecutor to "[stay] out of that area."

During closing argument, the prosecutor referred to Conrad's testimony and argued, "I said even if they have a recommendation that says they can exceed the state guidelines, you recommend they stay within the guidelines to avoid prosecution? Yes, I do. Okay. Well, why are you—why do you think we're seeing these recommendations when the State of California guidelines are six mature and 12 immature—"

At this point, the trial court stopped the argument and spoke to counsel in a sidebar. The court instructed counsel to "stay away from that limitation." The prosecutor

explained she was not "claiming that they have to go by state guidelines, I'm explaining they can—they can have a recommendation that says they can have more than the state guidelines …." The court informed counsel because the guidelines are unconstitutional to the extent they limit the defense, not to refer to the numbers within the guidelines.

At the conclusion of the prosecutor's argument, she stated:

> "These are people that shopped around to find a quantity from a doctor that would write whatever they told her to, and then they planted an exorbitant amount of marijuana, 296 plants in Groveland, 76 down in Oakland. They had it packaged for sale, along with cocaine packaged for sale, and now they're trying to hide behind the legitimate marijuana laws that allow for chronic patients to cultivate a small amount for their personal use, and they're trying to use that as a shield for their illegal operation. And I'm asking that you find them guilty of unlawful cultivation and possession for sale."

*Analysis*

Defendant argues the prosecutor's reference to state guidelines and her reference to marijuana laws allowing for the cultivation of a "small" amount of marijuana was misconduct as it suggested defendant was guilty simply because he exceeded state guidelines. We disagree.

To successfully raise a claim of prosecutorial misconduct, a defendant must show either a pattern of egregious conduct or the use of persuasive methods so deceptive as to create a reasonable likelihood such behavior prejudicially affected the jury. (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.) This means the prosecutor must engage in an egregious pattern of conduct infecting the trial with unfairness so as to render it fundamentally unfair, or engage in reprehensible, deceptive conduct. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

> "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury

24.

construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid.*)

Initially, we note that although defense counsel objected to the two questions during Dr. Karimi's cross-examination, he never objected on prosecutorial misconduct grounds. He likewise failed to request any sort of admonition. Furthermore, he never objected to any of the now challenged statements during closing argument, and never asked for an admonition. Thus, the issue is not reviewable on appeal. (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)

Defendant seeks to avoid forfeiture by arguing an admonition "would only have exacerbated the impact on the jury." A defendant may avoid the forfeiture rule where an admonition would not have cured the harm caused by the misconduct or if either a timely objection or a request for admonition would have been futile. (*People v. Price* (1991) 1 Cal.4th 324, 447, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165; *People v. Cole* (2004) 33 Cal.4th 1158, 1201.) There is no claim here that any objections would have been futile. To the contrary, the court sustained the objections during cross-examination and interrupted the prosecutor's closing argument regarding state guidelines on its own motion. Thus, the question is whether an admonition would have cured the harm in this case. We conclude it would have cured any harm.

As defendant concedes in his opening brief, the initial two references to the state guidelines during cross-examination were brief and did not detail the specific guidelines. Likewise, a reference to a "small" amount of marijuana did not mention any figures and related to the prosecutor's overall argument that the amount possessed in this case was not reasonably related to defendant's condition. As to the argument where the prosecutor began to delineate the state guidelines found in section 11362.77, we find an admonition would have cured any harm. An admonition to simply disregard any reference to state guidelines and to follow the court's instruction that the amount possessed or cultivated must be reasonably related to defendant's medical condition would have adequately

instructed the jury in this case. It would not have required a discussion on state guidelines as defendant suggests, nor would it require even repeating or delineating what the state guidelines were. Therefore, the claim is forfeited.

Even if we were to agree the claim was properly preserved and we assumed the conduct constituted misconduct, we would find any error harmless. The jury was properly instructed that under the CUA a defendant may possess or cultivate the amount of marijuana that is reasonably related to his current medical needs. The jurors were further instructed to follow the law as provided by the court, and to the extent the arguments of counsel conflicted with the law, they were to follow the court's instructions. There was never an argument that possession of marijuana in an amount over the guidelines required a guilty finding. Indeed, the reference defendant complains of that specifically referenced the quantities contained in the state guidelines was incomplete, and the court stopped the prosecutor before she recounted what the guidelines listed. Furthermore, the argument itself assumed a recommendation could exceed the guidelines, and defendant's recommendation allowed him to possess up to 10 pounds of marijuana. It is not reasonably probable the jury would have interpreted these comments in the manner suggested by defendant.

The prosecutor argued defendant possessed and cultivated the marijuana in this case for the purpose of sales, not for any medical need. Defendant also emphasized the amount possessed and cultivated was reasonably related to his medical needs. In context of the trial as a whole, the jury would not reasonably construe the brief references to state guidelines in this case as an argument that anything over that amount would require a finding of guilt.

Furthermore, the evidence of both the possession for sale of marijuana count and the cultivation count was strong. In addition to the five pounds of marijuana defendant admitted possessing, approximately 15 additional pounds were found in defendant's home. Eleven and a half pounds were located in a box with defendant's medical recommendation posted on the lid, and several items bearing defendant's name, including

26.

a contract dated the very day of the search, were located in the same room. The marijuana possessed by defendant in his car was packaged identically to some of the marijuana in the JOBOX. Furthermore, there were indicia of sales located nearby, such as scales, bulletproof vests, a surveillance system, and pay/owe sheets. Defendant's bank records indicated several significant cash deposits in the recent months. Although defendant claimed the money came from rent and from jobs he completed for cash, those amounts were not reflected on his tax returns. There was no evidence of any marijuana edibles or any marijuana paraphernalia at either defendant's home or the Oakland site, although defendant claimed he needed to consume a substantial amount of marijuana on a daily basis. Based on the evidence produced at trial, the arguments of counsel, and the instructions provided to the jury there is no reasonable probability the jury interpreted the brief and isolated comments in the manner defendant suggests. Thus, any error was necessarily harmless.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
LaPORTE, J.*

---

*Judge of the Kings Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.