Filed 7/9/14  P. v. Coleman CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MANDALE JAMES COLEMAN,<br><br>        Defendant and Appellant. | A137910<br><br>(Contra Costa County<br>Super. Ct. No. 110690-5) |

Defendant Mandale Coleman challenges his robbery and burglary convictions based on alleged instructional error. He contends, inter alia, that the court erred in denying his request for an instruction on the mistake of fact defense with respect to the robbery charge, requiring reversal of both convictions. We disagree and affirm. Both parties agree the calculation of Coleman's presentence custody credits must be corrected, and we remand for that limited purpose.

## I.    BACKGROUND

In May 2011, Coleman was charged by information with first degree residential robbery (Pen. Code, §§ 211, 212.5, subd. (a)[1]; count 1); first degree residential burglary (§§ 459, 460, subd. (a); count 2); assault with a firearm (§ 245, subd. (a)(2); count 3); grand theft of a firearm (§ 487, subd. (d); count 4); and receipt of stolen property (§ 496, subd. (a); count 5). As to counts 1, 2 and 3, it was alleged that he personally used a firearm in committing the offense. (§§ 12022.53, subd. (b), 12022.5, subd. (a).) As to

---

[1] All further undesignated statutory references are to the Penal Code.

count 2, it was further alleged that the offense qualified as a violent felony because a nonparticipant in the burglary was present in the residence during the commission of the burglary. (§ 667.5, subd. (c)(21).)

A.     *Trial Evidence*

Julian Cooks testified that on November 26, 2010, at about 3:45 a.m., he was in his second-floor apartment in Richmond getting ready for work. His girlfriend Leah Trevillion was asleep in the apartment. Cooks grabbed his keys and cell phone, and unlocked and opened his front door and a metal security door. As he opened the security door, somebody dressed in a black hooded sweatshirt and dark blue jeans jumped up, grabbed the door, and pointed a gun at Cooks's face. At trial, Cooks identified the intruder as Coleman. At trial, Cooks testified that the intruder was carrying a backpack.[2]

Coleman angrily made demands like: "Give me everything. Where is the money? I know you got some money in here." Cooks retreated to the kitchen area of the apartment and said, "There's nothing in here." Coleman, who was much larger than Cooks, raised his gun over his head and swung it down at Cooks. Cooks ducked, the gun "kind of hit [him] in the shoulder," and he stumbled but did not fall. After making more demands, Coleman again raised the gun and swung it at Cooks, and this time the gun caught Cooks "hard" somewhere close to his neck or shoulder.

Cooks at some point realized that the gun in Coleman's hand was a gun that had been stolen (along with a television, video game console, $100 and other property) from Cooks's apartment three weeks previously. Cooks testified that he had reported the burglary to the police, including the theft of the gun. The gun was a .22 caliber Ruger with a wooden handle and as far as Cooks knew it was loaded.

Cooks told Coleman, "You broke in my house already. You think there's something here?" Coleman then pointed the gun to the ground and started to pull back the slide. Because Cooks knew the slide was difficult to move, which would cause a

---

[2] At the preliminary hearing, when Cooks was asked if the intruder came in with a backpack he responded, "I didn't notice what he had but the gun."

delay, he rushed Coleman. "We had a short tussle. I was able to get him off of me, and I believe he fell to the ground. I got out of the door." Cooks left his cell phone and the gun behind. Cooks testified that he did not know what happened to the gun or cell phone during the tussle.

Cooks ran to a gas station around the corner and called the police. A recording of his 911 call was played for the jury. Cooks said, "Somebody just pushed me in my house with a gun. . . . [He] already broke in my house like, like maybe a month ago." Cooks said the intruder was wearing black pants and a black hood, and "I know who he is. I know exactly what he looks like." When asked how he knew him, Cooks said, "I mean, uh, I seen him around here before" in the neighborhood. When asked if he had a gun in his apartment, he said, "No. Look like he had the one that they stole from me the last one." The recording reflects that Cooks then shouted, "That's him right there!" and he started addressing a police officer on the street.

Cooks testified that he had started to return to his apartment when he saw a police car approach and saw Coleman descend the stairs of his apartment building. Cooks waved at the officer to indicate that Coleman was the suspect. Coleman ran up Barrett Avenue and the officer chased after him. Coleman then changed direction and started running toward Cooks. As he passed Cooks, Cooks grabbed him and pulled him to the ground and the police then handcuffed him. Cooks testified that his cell phone was found on Barrett Avenue under a car or on a curb. The gun was found on Barrett Avenue near the cell phone. When Cooks returned to his apartment, he found the backpack that Coleman had been carrying: it was on the living room floor along with a suitcase that had been taken from Cooks's hall closet. The apartment was ransacked.

Trevillion testified that on November 26, 2010, at about 3:45 a.m., Cooks kissed her goodbye as he was leaving for work. He was exiting the front door when Trevillion heard someone say loudly and angrily, "Put your hands up. Give me everything." Cooks responded that he did not have anything. Then Trevillion heard, "boom, boom, boom"— "they're fighting. They're . . . wrestling. They're tussling"—and then it became quiet. She crawled into the space between the bed and the wall and pulled covers over her

3

because she was scared. She then heard another "boom" that sounded like the security door slamming, and the sound of cabinets being opened and closed and things falling over. She heard a man's voice in the hallway, sounding as if he was looking for things and getting frustrated. She heard him dial a phone and make the following statements: " 'I'm looking around. I can't find anything. [¶] . . . [¶] . . . I looked everywhere. I'm going through stuff. I don't see a bowl. [¶] . . . [¶] Aw, shit.' " Trevillion understood "bowl" to refer to a bowl containing marijuana. While still on the phone, he entered the bedroom, searching, and inadvertently pushed the mattress over Trevillion, further hiding her. He then ran off. She never saw the intruder and did not recognize Coleman at trial.

Trevillion recognized the voice on the other end of the intruder's phone conversation as that of D.C. Garrison, someone she had known for many years. Right after the burglary, at about 4:00 or 5:00 a.m. that same morning, Garrison came by the apartment. Garrison was Coleman's half-brother and both Trevillion and Cooks testified that Garrison was a good friend of Cooks who came by Cooks's apartment almost every day. According to Cooks, Garrison had never brought anyone with him to Cooks's apartment, and Coleman had never been inside Cooks's apartment. Cooks denied that he sold marijuana to either Garrison or Coleman. Cooks testified that he had never sold marijuana to anyone from that apartment and said that he had no more than an eighth of an ounce of marijuana in the apartment for personal use. Trevillion testified that Cooks smoked a lot of marijuana and often had a one- or two-week supply in his apartment. She had seen Cooks smoke marijuana with Garrison, but as far as she knew Cooks did not sell marijuana. Trevillion had seen a gun under Cooks's mattress a couple of weeks before it was taken during an earlier burglary, a few weeks before the November 26, 2010 incident.

Richmond Police Officer Virgil Thomas reported to Cooks's apartment about five to 10 minutes after the 911 dispatch went out. Cooks told him the intruder was an adult Black male wearing all black clothing, and Cooks said he had previously seen the intruder in the area. Cooks told Thomas the intruder had struck him in the face and neck twice with a chrome handgun.

4

Richmond Police Officer Darryl Kimura was assigned to process the crime scene. At the direction of other officers, he recovered the gun and cell phone from the street. The gun and a magazine were less than 20 feet apart on a sidewalk on Barrett Avenue. The gun's chamber was empty, but the magazine was loaded with eight live .22 caliber cartridges and appeared to be compatible with the gun. A few feet away from the gun and magazine, Kimura recovered the cell phone from underneath a parked car.

Kimura went to Cooks's apartment and observed that the living room was in disarray. Another officer told him that a backpack on the living room floor did not belong to Cooks. Inside the backpack, Kimura found medical and school papers with Coleman's name on them. The backpack did not contain marijuana or money. A suitcase and a duffel bag were also on the living room floor. The bedroom in Cooks's apartment appeared to be ransacked. He processed the cell phone for fingerprints but did not find any usable latent prints. Kimura processed Coleman at about 5:15 a.m. Coleman was wearing a black shirt and a gray hooded jacket. Kimura also spoke to Cooks about two hours after the incident. Cooks had no injuries on his face. He had three small vertical scratches on his neck that were consistent with fingernail scratches, but no bruising on his neck. He did not complain of shoulder pain.

Coleman testified in his own defense. In November 2010, he was living in Sacramento and attending American River College, but he would come down to Richmond about six times a year to "[k]ick[] it" with Garrison or buy and smoke marijuana with him. Garrison told Coleman that Cooks was his marijuana supplier. Coleman had personally bought marijuana from Cooks a few times outside Cooks's apartment and once inside his apartment. He bought a half pound or a pound at a time and he would resell some of it to his friends and classmates.

On November 25, 2010, Coleman drove to Richmond from Sacramento to spend Thanksgiving with Garrison and buy some marijuana for resale. He and Garrison went to Cooks's apartment in the evening and Coleman bought a pound of marijuana from Cooks for $2,200. Cooks measured loose marijuana out of a large bowl, which was about two feet in diameter and a foot high, and put Coleman's marijuana in a large Ziploc plastic

bag.  Coleman put the bag in a backpack he had brought with him.  The men then smoked marijuana and drank alcohol.  Coleman, who was on Vicodin at the time because he had a broken jaw, apparently became intoxicated because the next thing he remembered was waking up in Garrison's apartment.  It was about 3:00 a.m., and he wanted to get back to Sacramento, but he could not find his backpack in Garrison's apartment or in Coleman's car.  He woke up Garrison, who said he thought the backpack was still in Cooks's apartment.

Garrison drove Coleman to Cooks's apartment and waited in the car while Coleman went up to Cooks's apartment.  Although Coleman had his own car and planned to return to Sacramento, he had Garrison drive so he could save on gas.  Also, although it was early morning, Coleman was not concerned about waking Cooks because "in my history of dealing with people who sell drugs, they open 24/7."

Coleman knocked on the door.  He was unarmed and he went there to retrieve his marijuana, not to rob Cooks.  "I'm bamming on the screen door.  He doesn't answer, so I stop, I look at my brother who's in the car.  He says that he's in there, so I bam again."  Cooks opened the door and, yelling, asked "what the fuck [was Coleman] doing on the porch at 3:45 in the morning."  Coleman said, "I just came here to get my shit."  Cooks said, "What are you talking about?" and Coleman said, "My brother said my backpack is over here when we left from yesterday."  Coleman opened the security door and they were standing face to face, tense and both in something of a fighting stance.  Coleman said, "Man, just give me my stuff so I can go," but Cooks denied that Coleman's property was there.

Coleman then hit Cooks.  "[W]hen I first swung, he seen it coming so he ducked.  But when he ducked, he rushed me, but me being a bigger guy, I rushed him back and we fell onto the living room floor," right by the front door.  "I'm on top of him and I'm hitting him. . . . [Then] he gets a good hit.  He hits me right in the jaw."  Cooks then "gets on top of me[.] . . . I put my hand up and try and get him off of me[.] . . . [H]e's hitting me, and that's his second good blow, and I'm lightweight dazed because at the time I had a broken jaw" and was on Vicodin.  The second blow was painful and Coleman started

6

bleeding. "I think I get hit again, and I go out. . . . I don't know how long it was, but when I regained my senses, he's no longer in the apartment with me."

When Coleman came to on the living room floor, he saw the gun for the first time. The magazine was probably inside the gun at that time. He had never seen the gun before, he had no knowledge that it had been previously stolen, and he never pointed it at Cooks or hit Cooks with it. He picked up the gun, because Cooks "was getting the best of me." Coleman "look[ed] at the situation like this: The gun is right there. . . . I couldn't find my weed, I couldn't find my backpack, so I took the gun." Coleman figured he could sell the gun to recoup some of his money.

Coleman called Garrison from inside the apartment and said he did not see his backpack. Garrison said the marijuana might be in a bowl on the table, but it was not there. Coleman said, "I can't find it," and Garrison said he should look in the bedroom. Coleman searched hurriedly through the kitchen, bedroom, and a closet. He did not remember touching or moving a suitcase or duffel bag. He never found his backpack. He gave up and left the apartment with the gun and his own cell phone, which was a "raggedy," narrow, rectangular Samsung Metro PCS cell phone with a clip.

Outside the apartment, Coleman saw Cooks in the middle of 22nd Street near Barrett Avenue. Coleman ran past him and Cooks gave chase. Coleman then saw the police approaching, so he tossed the gun—the magazine probably fell out when he tossed it—and started running back toward 22nd Street. He did not flag down the police for help because "where I'm from, we handle stuff ourself [*sic*]. We don't go to the police." The police then started chasing him. Coleman turned onto 22nd Street and after a few steps was tackled by Cooks and then restrained by the police. Coleman was not asked at trial about, and did not testify about, how the cell phone ended up under the parked car.

B.    *Jury Instructions and Verdict*

In addition to instructing the jury on the charged offenses and enhancement allegations, the court provided (over Coleman's objection) CALCRIM No. 376, which informed the jury that robbery or burglary could be proved by evidence of possession of recently stolen property and slight additional evidence. The court refused a defense

7

request to instruct the jury on the mistake of fact defense (CALCRIM No. 3406) with respect to the alleged robbery of Cooks's cell phone.

After deliberating for one day, the jury convicted Coleman on all three charged counts and found all of the enhancement allegations true. The court sentenced Coleman to a three-year mitigated term for robbery plus an additional 10 years for the firearm use enhancement, for a total of 13 years. The sentence for burglary, which was stayed, was the four-year mitigated term plus four years for the firearm use enhancement. The sentence for assault, which was also stayed, was the three-year middle term plus four years for the firearm use enhancement.

## II.    DISCUSSION

A.    *Failure to Provide Mistake of Fact Instruction*

Coleman argues the court prejudicially erred in denying his request to instruct on mistake of fact. We disagree.

1.    *Standard of Review*

A defendant may refute guilt by showing a mistake of fact that disproved a required criminal intent. (*In re Jennings* (2004) 34 Cal.4th 254, 276–277; *People v. Lawson* (2013) 215 Cal.App.4th 108, 118 (*Lawson*) [a defense of mistake of fact serves only to negate the mental state element of the offense charged, and as such amounts to no more than a claim that the defendant acted without forming the mental state necessary to make his or her action a crime].) The "defense" of mistake of fact requires an actual belief "in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act . . . ." (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1425, superseded on other grounds as stated in *Lawson,* at p. 118.) "For general intent crimes, the defendant's mistaken belief must be both actual and reasonable, but if the mental state of the crime is a specific intent or knowledge, then the mistaken belief must only be actual." (*Lawson,* at p. 115; see also Judicial Council of Cal., Crim. Jury Instns. (2014) Bench Notes to CALCRIM No. 3406, pp. 1009–1010, citing *People v. Russell,* at p. 1425 & *People v. Reyes* (1997) 52 Cal.App.4th 975, 984 & fn. 6.) " ' "[W]hen a defendant presents evidence to attempt to negate or rebut the prosecution's

8

proof of an element of the offense, . . . a court may . . . have a duty[, on request,] to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt . . . ." ' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997 [defense of accident]; *Lawson*, at p. 117.) "[W]hen a defendant requests instructions on a legally correct defense, the charge must be given if it is supported by evidence ' " 'sufficient to raise a reasonable doubt' " ' if believed by the jury. [Citation.] ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." ' [Citation.]" (*People v. Eid* (2010) 187 Cal.App.4th 859, 879.) "Whether or not the evidence provides the necessary support for drawing [a] particular inference is a question of law. [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145.)

        2.     *Did Substantial Evidence Support the Instruction?*

Coleman requested CALCRIM No. 3406 "regarding whether Mr. Coleman may have believed that the cell phone he had taken was his." Coleman argues the court had a duty to provide the instruction because it was supported by substantial evidence. We disagree.

Cooks's cell phone was found under a car on Barrett Avenue not far from where the gun was found. Cooks identified his cell phone at the scene, and it was returned to him. Photographs of the recovered cell phone were admitted in evidence at trial, and Cooks identified the cell phone shown in the photographs as his.

Coleman initially testified that he did not remember having a cell phone with him when he left Cooks's apartment, but then said that he left the apartment with his own cell phone (which he had used to call Garrison) and with Cooks's gun. He described his cell phone as "a Samsung. It's raggedy. I dropped it a million times. It's a Metro PCS. It's real narrow, like a rectangle narrow. . . . [¶] . . . [¶] . . . [F]rom Metro you could buy a necklace, and you clip the phone to it, and I had the thing that you clip the phone to it on it." The description given by Coleman is consistent with Cooks's cell phone as shown in the evidence photographs.

9

The trial court concluded that there was no substantial evidence to support the instruction. "There was testimony from Mr. Cooks as to a black Samsung telephone which he identified in the photographs. That telephone was returned to him. [¶] Mr. Coleman testified that he had a black Samsung Metro PCS cell phone with some type of clip or telephone piece. There was no testimony that he grabbed the wrong cell phone or why he would have thrown his own phone underneath the car. . . . [T]hat was not substantial evidence for a mistake of fact as to that cell phone." [3]

The substantial evidence which is necessary to support a jury instruction is " 'evidence sufficient to deserve consideration by the jury, i.e., evidence from which a jury composed of reasonable [people] could have concluded that the particular facts underlying the instruction did exist.' [Citation.]" (*People v. Strozier* (1993) 20 Cal.App.4th 55, 63; see also *People v. Marshall* (1997) 15 Cal.4th 1, 39–40; *People v. Williams* (1992) 4 Cal.4th 354, 361.) "The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct . . ." (*People v. Lewis* (2001) 25 Cal.4th 610, 646), and in determining whether there is substantial evidence to support an instruction, the trial court is bound to take the defendant's testimony, at least for this limited purpose, as entirely true, regardless of whether it was of a character to inspire belief. (*People v. Wilson* (1967) 66 Cal.2d 749, 762.) But, a jury instruction "need not be given whenever *any* evidence is presented, no matter how weak." (*People v. Strozier,* at p. 63.) Our high court has also stressed that " 'unsupported theories should not be presented to the jury.' [Citation.]" (*People v. Marshall,* at p. 40.)

Here, Coleman never claimed that he took a cell phone from Cooks's apartment in error, and he was never asked to identify the cell phone shown in the photographs as his (or even as similar to his). The only cell phone recovered in the area of the police chase was unequivocally identified as *Cooks's* cell phone, and Coleman himself offered no

---

[3] Coleman apparently did not submit his own proposed instructions, and the only reported discussion of requested form instructions is a brief summary by the court and counsel of earlier off the record discussions.

explanation of what became of *his* cell phone if the one found underneath the car was not his. Coleman's testimony did not suggest how he might have entered Cooks's apartment in possession of one cell phone and left in possession of another. He testified only that he had *his own* cell phone, which he described in particular detail—one he had taken with him into the apartment and that remained in his possession as he left the apartment. He specifically denied any recollection of taking Cooks's cell phone. Defense counsel did not argue that Coleman had taken Cooks's cell phone in error. He did not suggest to the jury that two virtually identical cell phones were somehow present in Cooks's apartment at the time of the robbery, and that Coleman was simply confused by the similarity. Counsel instead argued that there was no robbery because Cooks's testimony that the phone was his was uncorroborated, and the cell phone found under the car on Barrett Avenue was *in fact* Coleman's own cell phone. Counsel argued, "[M]aybe Mr. Coleman dropped *his* phone while he was running . . . ." (Italics added.) When the evidence supporting the defense is minimal and insubstantial, the trial court need not instruct on it. (*People v. Barnett, supra,* 17 Cal.4th at p. 1145.) The instruction was properly refused.

Even if we were to conclude that it was error to refuse the instruction, we would still find any error to be harmless. Coleman argues that the error is subject to review under the *Chapman*[4] standard—whether the error was harmless beyond a reasonable doubt.[5] "Error in failing to instruct on the mistake-of-fact defense is subject to the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [(*Watson*)]." (*People v. Russell*, *supra*, 144 Cal.App.4th at p. 1431.) Under *Watson*, reversal is warranted only if it appears " 'reasonably probable' the defendant would have achieved a

[4] *Chapman v. California* (1967) 386 U.S. 18.

[5] Coleman also argues that an erroneous refusal to instruct on a defense as requested by the defendant is reversible error per se. (See *U.S. v. Escobar de Bright* (9th Cir. 1984) 742 F.2d 1196, 1201–1202 [failure to instruct on a defense supported by evidence and law is per se reversible error]; see also *U.S. v. Zuniga* (9th Cir. 1993) 6 F.3d 569, 571–572 [same but recognizing exception where other instructions adequately cover the defense theory]; *U.S. v. Romm* (9th Cir. 2006) 455 F.3d 990, 1002 [same].) Ninth Circuit decisions, of course, are not binding on this court. (*People v. Federico* (2011) 191 Cal.App.4th 1418, 1424, fn. 4.)

11

more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149.) "Appellate review under *Watson* 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.] 'There is a reasonable probability of a more favorable result within the meaning of *Watson* when there exists "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result." ' [Citation.]" (*People v. Russell,* at p. 1432.) Here, the jury was presented conflicting scenarios which, among other things, required the jury to determine whether Coleman had a criminal purpose and intent at the time he entered Cooks's apartment, even before the cell phone was taken. In returning verdicts on all counts and all enhancement allegations (and rejecting any lesser included offenses), the jury necessarily rejected Coleman's entire version of events and accepted Cooks's testimony that his cell phone was forcibly taken from his person or immediate presence. We find no reasonable probability of a more favorable result had the instruction been given.

Moreover, the alleged instructional error does not require reversal if the jury necessarily resolved the factual issue of intent adversely to Coleman under other, properly given instructions. (*People v. Howard* (1992) 1 Cal.4th 1132, 1172.) The jury was properly instructed on the burden of the prosecution to prove its case beyond a reasonable doubt. (CALCRIM No. 220.) The jury was told that the crime of robbery required that the defendant not only "intentionally commit the prohibited act, but must do so with a specific intent and/or mental state." (CALCRIM No. 251.) The court properly defined the elements of robbery, including the requirement that the prosecution prove that Coleman: 1) took property "not his own"; 2) from another person's "possession and immediate presence"; 3) against that person's will; 4) using force or fear; and 5) with the specific intent to "deprive the owner of it permanently or to remove it from the owner's

12

possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property." The jury was instructed that the required intent to take the property must have been formed "before or during the time [the defendant] used force or fear." (CALCRIM No. 1600.) "The instruction explains the act and the intent elements of the offense and that the act must have been motivated by the requisite intent: the intent to steal. [Citations.]" (*People v. Anderson, supra,* 51 Cal.4th at p. 999.)

In closing argument, the prosecutor argued Coleman was guilty of robbery because he took Cooks's cell phone from Cooks's immediate presence. "It was grabbed from his hand or during the struggle in the apartment." Moreover, "force and fear was used. . . . Mr. Coleman pointed a gun, was threatening Mr. Cooks . . . ." Finally, Coleman "intended to deprive [Cooks] of his cell phone. How do we know that? He left the scene with Mr. Cooks' cell phone and he discarded the cell phone." As noted *ante*, the defense argued that no robbery had occurred because the cell phone found under the car on Barrett Avenue was in fact Coleman's own cell phone, which Coleman dropped while he was running. The jury necessarily found beyond a reasonable doubt that the cell phone Coleman took from the apartment in fact belonged to Cooks, and that Coleman took the cell phone with the specific intent to steal. Otherwise, it could not have convicted Coleman of robbery.

B.      *CALCRIM No. 376*

Coleman also argues he was prejudiced with respect to both his robbery and burglary convictions by the giving of CALCRIM No. 376 over his objection. We disagree.

In addition to instructing the jury on the crimes of robbery and burglary, the court instructed, consistent with CALCRIM No. 376: "If you conclude that the defendant knew he possessed property, and you conclude that that property had, in fact, been recently stolen, you may not convict the defendant of . . . [r]obbery and [b]urglary . . . based on those facts alone. [¶] However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient . . . . [¶] The

13

supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt. [¶] Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Coleman contends that he was prejudiced by this instruction with respect to the robbery charge because he possessed the gun which Cooks said was stolen from him three weeks earlier. He insists that an inference of guilt premised on possession of the stolen gun would be only impermissible evidence of criminal disposition. Coleman also argues he was prejudiced by this instruction with respect to the burglary charge because the jury could have relied on evidence that he had possessed Cooks's *cell phone* after leaving the apartment (i.e., evidence he possessed recently stolen property) plus slight additional evidence to find that he committed burglary. The jury's subsidiary finding that the cell phone was recently stolen property would have, in turn, been the product of the court's erroneous failure to instruct on the mistake of fact defense.

We are not persuaded for several reasons. First, although Coleman objected in the trial court to the giving of CALCRIM No. 376, he did not do so on the grounds he asserts here. He argued the instruction would be confusing because it was designed to assist a jury in determining the issue of identity, but that was not a disputed issue in this case. He did not argue the instruction might confuse the jury because it did not clarify which alleged recently stolen property—the gun or the cell phone—was potentially relevant to proof of the robbery and burglary charges, respectively, and he did not object that the instruction improperly allowed consideration of propensity evidence. His claims are therefore forfeited. "Defendant did not request the clarifying language he now contends was crucial and may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 113.)

14

As to the burglary charge, the prosecutor did not argue to the jury that Coleman's possession of either the cell phone or the gun was evidence that supported his conviction for burglary. The prosecutor mentioned the cell phone only with respect to the robbery charge, and only as evidence that the cell phone itself had been taken from Cooks in the robbery. The prosecution was not required to prove an actual theft occurred in order to prove burglary. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041–1042.) The prosecution theory was that Coleman entered Cooks's apartment on November 26, 2010, with an intent to take anything of value that he could find, not to take specific property, and that he entered with the gun, not that he stole the gun from Cooks on that day. This theory did not depend in any way on Coleman's possession of a stolen cell phone. Coleman was properly convicted of burglary even if the jury believed his testimony that he came to Cooks's apartment only to recover marijuana he had previously bought from Cooks (i.e., even if he had no intent to steal property that belonged to Cooks or to assault Cooks with a firearm). A defendant's claim of right to property is not a defense to an armed burglary if the claimed property was obtained as the result of a notoriously illegal transaction such as a drug deal. (*People v. Barnett, supra,* 17 Cal.4th at pp. 1142–1144; *People v. Tufunga* (1999) 21 Cal.4th 935, 953–954, fn. 5.)

Coleman acknowledges that an argument similar to that he makes here was rejected in *People v. Lopez* (2011) 198 Cal.App.4th 698. In that case, the defendant also argued that, pursuant CALCRIM No. 376, the jury could infer guilt of the charged burglary if it found that the defendant was in possession of recently stolen property regardless of whether or not it was a product of the charged offense and also found slight corroborating evidence of the charged offense. (*People v. Lopez,* at p. 708.) In rejecting Lopez's challenge to the instruction, the court noted that "CALCRIM No. 376 cautions the jury *against* inferring guilt based solely upon a defendant's conscious possession of recently stolen goods. It would be unreasonable and illogical for the jury to construe this instruction to also *permit* it to infer guilt *on a burglary charge,* because a defendant possessed property stolen *during a completely different theft.* ' "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will

15

abandon them when presented with a court's instructions. [Citations.]" [Citation.]' [Citation.]" (*People v. Lopez*, at p. 710.)

Coleman attempts to distinguish *People v. Lopez* on the basis that the prosecution in that case argued only that the property taken in the offense with which the defendant was charged supported an inference of guilt. Coleman argues that here, in contrast, the prosecutor "repeatedly urged that [Coleman's] possession of Cooks' recently stolen gun was probative of his guilt" on the robbery charge. This is a mischaracterization of the prosecution argument. The prosecutor never argued that possession of the stolen gun was probative of Coleman's guilt of this offense, or argued that an inference under CALCRIM No. 376 should be drawn. The prosecution argument was simply responsive to Coleman's testimony that he took the gun from the apartment only on November 26, 2010. She never referred to the text or substance of the CALCRIM No. 376 instruction in her closing argument with respect to any of the charges.

We conclude Coleman was not prejudiced by any error in failing to instruct the jury on the specific stolen property that was relevant to the application of CALCRIM No. 376.

C.      *Presentence Custody Credits*

Coleman argues, and the People concede, that he is entitled to two additional days of presentence custody credits. Coleman was arrested on November 26, 2010. He was sentenced 792 days later, on January 25, 2013, but was awarded only 790 days of actual custody credit. He should have been awarded a day of credit for every day he actually spent in custody. (§ 2900.5, subd. (a); *People v. Smith* (1989) 211 Cal.App.3d 523, 526.)

### III.      DISPOSITION

Coleman's conviction for robbery and the true finding on the related enhancement and his convictions for burglary and assault with a firearm and the true findings on the enhancements related to those convictions are affirmed. The case is remanded to the trial court for the limited purpose of correction of the number of

16

presentence actual custody credits Coleman had earned at the time of his prior sentencing from 790 to 792 days.

_____

Bruiniers, J.

We concur:

_____

Jones, P. J.

_____

Needham, J.